(55 Misc. Rep. 110.)

## GAUSE v. COMMONWEALTH TRUST CO.

(Supreme Court, Trial Term, New York County. June, 1907.)

1. BANKS AND BANKING—TRUST COMPANIES—ULTRA VIRES CONTRACTS.

A trust company was organized under Laws 1892, p. 1842, c. 689. Its vice president, with the consent of its president, but without the knowledge of its directors, signed an instrument under seal, in the name of the corporation, guaranteeing to the owner of certain bonds and stocks the sale thereof before a certain date at not less than a certain sum. The trust company at the time owned no bond or stock of such corporation, nor was it interested in the sale of its securities, otherwise than by the commission it might acquire. *Held*, that the contract was ultra vires.

2. SAME—AUTHORITY OF OFFICER.

The right of a trust company to guarantee a sale of certain stock and bonds at a specified price within a certain time being questionable, the holder of the stock was put on inquiry as to the authority of an officer of the trust company to execute a guaranty of that nature on behalf of the company.

3. SAME—ENFORCEMENT—PERFORMANCE BY OTHER PARTY.

Where a trust company guaranteed to plaintiff to sell certain stocks and bonds for him at a certain time at a fixed price, but there was no delivery to defendant of such securities, there was no such performance by plaintiff as entitled him to recover on the ground that the contract of a corporation will be enforced, where the corporation has received the full benefit thereof, though it be ultra vires.

Action by Harry S. Gause against the Commonwealth Trust Company. Complaint dismissed.

Howard A. Taylor, for plaintiff.
D. Cady Herrick, for defendant.

GREENBAUM, J. The alleged contract upon which plaintiff seeks to hold the defendant liable for damages is set forth in Gause v. Commonwealth Trust Co., 111 App. Div. 530, 97 N. Y. Supp. 1091. The testimony is uncontradicted that the vice president of the defendant corporation, with the consent of its president, but without the knowledge or authority of the board of directors or its other officers, signed the paper writing in question in the name of the corporation and affixed thereto its corporate seal. The meaning of the instrument, if valid, was to guarantee the plaintiff, who was the owner of certain bonds and stocks of the United States Shipbuilding Company, the sale, on or before August 23, 1903, of said securities at not less than certain specified prices, whether such sale was effected through the efforts of the syndicate therein referred to or otherwise. The defendant was organized as a trust company under chapter 689, p. 1842, of the Laws of 1892, known as the "Banking Law." The obligation ostensibly assumed by the defendant was in itself clearly one outside of its purview, scope, or power. The transaction did not constitute a purchase of securities. The defendant was not even to profit by a sale of the securities above the figures mentioned, but any sum that might be realized above these figures was also to belong to the plaintiff. The only conceivable advantages accruing to the defendant by the execution of the contract were the commissions it might earn and the prestige as a new company it might acquire in being connected with the underwriting of

the securities of the shipbuilding company, then believed to be a conspicuous, important, and likely successful corporate enterprise, and in acting as its transfer agent and registrar. It does not appear that the defendant corporation, when its vice president signed the alleged contract, owned any of the bonds or stocks of the United States Shipbuilding Company, nor that it was interested in the advantageous sale of its securities, otherwise than as already mentioned.

It may be stated here that plaintiff contends that the defendant was deeply concerned in upholding the values of the shipbuilding securities, because of its indorsements or guaranties of certain large loans made to certain individuals by the National Park Bank and other banks upon the bonds and stocks of the United States Shipbuilding Company. One of these individuals was Mr. Dresser, the then president of the defendant trust company. The guaranties in question were made by the president under circumstances that would indicate that he failed to realize that he was a trustee charged with the execution of an important trust. He apparently treated the trust company as though it were his own individual property. No express or implied authorization to guarantee to other corporations loans made by them existed. A resolution appears in the minutes of the executive committee of the defendant under date of September 9, 1902, to the effect that the president is authorized "to make or guarantee loans in the company's name when necessary." Three members of the executive committee were recorded as present at this meeting, to wit: Mr. Dresser, the president, and Messrs. Wetmore and Greig. The minutes of the meeting of September 9th were apparently never approved of, and were not read until a subsequent meeting of the committee held on October 10, 1902, when action with reference to the minutes was deferred, owing to the objection of Mr. Wetmore that "he did not vote for the adoption of the resolution of guaranty." Upon the trial Mr. Wetmore testified that such a resolution "was never adopted." Apparently the guaranties had been made prior to September 9th. No knowledge of them had come to the board of directors until some time subsequently, and under the authorities, as I understand them, the guaranties, whether authorized or not, and in this case founded upon no consideration flowing to the defendant, were clearly ultra vires. Appleton v. Citizens' Bank, 116 App. Div. 404, 101 N. Y. Supp. 1027. The guaranties were also violations of the provisions of section 156 of the banking law that "no loans shall be made by any such corporation, directly or indirectly, to any director or officer thereof." The loans, being made to Dresser, the president of the defendant, come within the condemnation of this statute, in its spirit, if not its letter. Considering, too, the transactions in the light of the situation as it existed in August or September, 1902, when all concerned assumed that the shipbuilding securities held as collateral by the lending banks were valuable and ample to cover the loans, these alleged guaranties to the banks could not possibly have entered into the consideration of any of the parties when the alleged agreement in suit was executed. It was only later, when, possibly to avoid the disagreeable position of repudiating the acts of its president, an agreement, called the "Sheldon Syndicate Agreement," was entered into for the purpose of disposing of the hypothecated securities. Un-

106 N.Y.S.—19

der this agreement, dated October 29, 1902, the trust company took the title to the securities to enable it to transfer the title to them to the syndicate managers, who were to dispose of them.

Coming, now, to the plaintiff's interests in the shipbuilding securities, it appears that he was very largely interested in one of the companies which had sold its assets to the shipbuilding company. In part payment of such sale the plaintiff had received the bonds and stocks of the shipbuilding company, which were the subject of the agreement in suit. He was aware of the fact that steps were being taken to effect a syndicate agreement looking to the pooling of all securities of the shipbuilding company, to the end that high prices may be realized in their sale. A form of syndicate agreement had been prepared, with the essential purpose and feature of which he was entirely in favor; his only objection to the proposed agreement being that he did not know Mr. Clarke, the manager named therein. He was willing, however, to enter into the pooling scheme, providing the defendant company became a party to the agreement. It is evident that, when the paper writing in suit was executed, the president and vice president of the defendant company had unbounded faith and confidence in the successful outcome of the syndicate agreement. Filled with the sanguine expectation that the shipbuilding securities would be sold at prices beyond those limited in the agreement with plaintiff, the president and vice president recklessly involved the defendant corporation in the syndicate agreement. The anxiety of these two officers of the defendant to effectuate the pooling scheme may doubtless have been to some extent stimulated, whether consciously or unconsciously, by the circumstance that they were also at that time directors of the United States Shipbuilding Company, and presumably owners of its stocks and bonds. To my mind the contract attempted to be enforced against the defendant was clearly ultra vires. Under its charter it had no power whatever to enter into such a contract. If it were the owner of a considerable quantity of the bonds and stocks of the shipbuilding company it might with some plausibility be argued that it had the right to enter into an agreement which might protect its own holdings in the company. Its relation to the shipbuilding bonds and stocks was, however, purely fiduciary, and any agreement of guaranty, as already shown, would be illegal. The right to guaranty being ordinarily beyond the powers of the defendant corporation, it would follow that plaintiff would be put upon his inquiry as to the authority of the president and vice president to execute the instrument in suit and the power of the defendant corporation to engage in such an undertaking. The foregoing rule is peculiarly applicable to plaintiff, who was in a position to fully appreciate the relations of the defendant to the shipbuilding company securities, and who fully understood the purposes of the syndicate agreement, and that the defendant then had no concern therein, except as trustee. Unless authority in the vice president and power in the corporation are established, or a state of facts shown which would bind the corporation on the theory of an estoppel, there can be no recovery. There is no proof that either the president or vice president had previously engaged in any transaction like that under consideration, or that they or either of them had been given such broad and general powers to

act in behalf of the defendant as to justify the inference of an implied authority to execute the alleged agreement. It is conclusively and convincingly established by affirmative proof that no express authority was conferred upon these officials, and as matter of 'fact the other directors had no knowledge of the existence of the instrument until months after it had been signed.

The plaintiff relies upon the well-recognized rule of law that the seal of a corporation affixed to a written instrument, to which it is a party and which is signed by one of its proper officers, is prima facie proof that it was attached by proper authority. Quackenbos v. Globe & Rutgers F. Ins. Co., 177 N. Y. 71, 72, 69 N. E. 223. Assuming that the defendant was put to its proof as to the authority of its president or vice president to execute the alleged agreement, it seems to be well settled that the presumption of authority which the seal imports may be conclusively rebutted. It has already been shown that, excepting for the seal, no state of facts has been established which would warrant the inference that the plaintiff was justified in assuming that the vice president had authority to act for the defendant. As matter of fact it was proved that there was no actual authority. We have thus a case where the corporate seal was affixed without authority, and where the validity of the instrument to which it was affixed may be assailed by the corporation. Hoyt v. Thompson, 5 N. Y. 320, 335; Moore v. Rector, 4 Abb. N. C. 51. A presumption of fact arising in favor of a party, conclusively overcome by uncontradicted proof introduced by the opposing party, ceases having any probative force. McDonald v. Metropolitan St. R. Co., 167 N. Y. 66, 70, 60 N. E. 282; Kramer v. Kramer, 181 N. Y. 477, 481, 74 N. E. 474. I might rest my decision upon the conclusion that the facts establish a lack of authority in the vice president or president of the defendant to execute the alleged agreement. It may be well, however, independently of this, to consider whether the defendant is estopped from interposing the plea of ultra vires by reason of plaintiff's performance of the contract under the rule followed in this state, but not recognized in the federal courts. Vought v. Eastern Bldg. & Loan Ass'n, 172 N. Y. 508, 518, 65 N. E. 496, 92 Am. St. Rep. 761.

One of the conditions of the contract was that the plaintiff was to deposit with the defendant the bonds and shares of stock of the United States Shipbuilding Company. The deposit as matter of fact was never made. It is true the plaintiff contends that he stood ready at all times to deposit them, and that the injury to him was as complete as though he had in fact deposited them. The cases in the Court of Appeals that have considered the doctrine of estoppel as applicable to a corporate plea of ultra vires are collated in the Vought Case, at page 518 of 172 N. Y., and page 496 of 65 N. E. (92 Am. St. Rep. 761). A study of these cases shows that a contract ultra vires will nevertheless be enforced where either the person with whom the corporation has contracted or the corporation itself has received the full benefit thereof. In this case the inquiry would therefore be: Was the contract executed by the plaintiff? It seems to me unnecessary to elaborate upon the answer to this question, in view of Jemison v. Citizens' S. Bank, 122 N. Y. 135, 25 N. E. 264, 9 L. R. A. 708, 19 Am. St. Rep.

482, which, to my mind, was a much stronger case for invoking the doctrine of estoppel than the one at bar. In that case a savings bank had directed the plaintiffs to purchase for it cotton for future delivery. Plaintiffs executed the order and brought action against the defendant to recover "commissions and for money claimed to have been expended for the defendant in the purchase and sale of cotton futures." The plaintiffs contended that the defense of ultra vires was not available to defendant, "for the reason that the contract had been executed on the part of the plaintiffs." The court held that "the doctrine has no application to executory contracts which are sought to be made the foundation of an action or to contracts that are prohibited as against public policy or immoral." Says the court further:

"The most that can be claimed is that they [plaintiffs] held the cotton or the contracts therefor subject to the call or order of the defendant. There has been no delivery of any cotton or property of any kind or transfer of any title to such property to the defendant."

In the present case there was no delivery to or deposit with the defendant of plaintiff's securities, and assuredly there was not such performance by plaintiff as is contemplated by the authorities to deprive the defendant of the defense of ultra vires. In the Jemison Case there was a direct injury shown to have resulted to the plaintiffs, who executed defendant's order and were obliged personally to pay the loss sustained by reason of the purchase of the cotton in behalf of the defendant. Here the plaintiff was equally desirous with others, who were the holders of large blocks of the United States Shipbuilding stocks and bonds, to pool these securities under a syndicate agreement so that a high price for them might eventually be procured. He did nothing, after the execution of the agreement, except, as he claims, to hold the securities ready to be delivered to defendant upon call. Under such circumstances it cannot be said that plaintiff's part of the contract may be deemed executed, so as to entitle him to invoke the doctrine of estoppel against the defendant upon its plea of ultra vires.

The learned counsel for the plaintiff presents a most extraordinary argument to the court that this community "has viewed the powers of its trust companies in the broadest way," and he refers to certain institutions as illustrations of the fact that adroit and shrewd administrators of these companies are in the habit of undertaking business not strictly within their powers, so that they may reap unusual profits from such ventures, and that the stockholders and depositors of these institutions are ready to take "their chances" of the result of such business. Of course, such an argument is entitled to not the slightest consideration. Not only is there no evidence before me to uphold such a contention, but, even if there were, it would clearly be inadmissible as irrelevant. It is rather a novel proposition that, because a general practice may exist on the part of trust companies to override the powers conferred upon them by law, the court shall sanction such violations by ignoring the plea of ultra vires, to the end that such corporations may be compelled to observe what counsel designates "a business morality," which will not brook the repudiation of acts, even though unwarranted or unlawful, on the part of their chief executive officers.

It may be difficult to compel unfaithful or reckless guardians of trust companies to observe the restrictions imposed by law upon them, but it would be a sorry day when the courts encourage or palliate violations of law that may result disastrously to many innocent persons who have confided their property to the safekeeping of institutions in the justifiable belief that they were being conducted in accordance with legal requirements and with all the safeguards the law has provided.

In my opinion the plaintiff has failed to establish a cause of action against the defendant, and the complaint must be dismissed upon the merits.

Complaint dismissed upon the merits.