GAUSE v. COMMONWEALTH TRUST CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. February 21, 1908.)

1. APPEAL—SPECIAL VERDICTS—EFFECT ON APPEAL.

Where, in an action on contract for money, the special finding of the jury that the parol collateral agreement relied on by defendant was not made was supported by the evidence, plaintiff on appeal from a judgment of dismissal was entitled to the benefit of the finding, as provided by Code Civ. Proc. § 1187, providing for the rendition of general or special verdicts in actions for money, and that on appeal the special verdict shall form a part of the record, and that the appellate court may direct such judgment thereon as either party may be entitled to.

2. CORPORATIONS—CONTRACTS—AUTHORITY TO EXECUTE—EVIDENCE.

On the issue whether a contract, signed by a trust company by its vice president and sealed by its seal, was authorized by the company, governed by Banking Law, Laws 1892, p. 1912, c. 689, § 161, providing that its corporate powers shall be exercised by a board of directors, and Stock Corporation Law, Laws 1890, p. 1071, c. 564, § 27, authorizing the directors of a stock corporation to appoint officers with power to manage the affairs of the corporation subject to the control of the directors, evidence examined, and held not to show that the contract was authorized by the company.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 1737.]

3. SAME—PRESUMPTIONS.

Proof that the seal of a corporation whose name was signed to a contract was attached thereto is prima facie evidence that the contract was signed by the authority of the corporation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 1737.]

4. SAME.

Though persons dealing with a business corporation may rely on the apparent authority of its officers, yet, in the absence of evidence on which to predicate an estoppel as by holding out as authorized, or a course of dealing, the question is whether a contract with a corporation was

authorized, and when it appears that it was not, and that there has been no estoppel, the corporation is not liable.

5. SAME—ESTOPPEL.

On the issue whether a corporation was estopped from questioning the validity of a contract signed in its name by its vice president without authority, it appeared that the corporation received no benefit from the contract, and that as a corporation it had no knowledge of the making thereof. The officers having knowledge of the contract kept it secret from the corporation because of their interests, and because of their fear that it would not be ratified by the corporation. *Held*, that the corporation was not estopped from assailing the validity of the contract.

Ingraham and Clarke, JJ., dissenting.

Appeal from Trial Term.

Action by Henry T. Gause against the Commonwealth Trust Company of New York. From a judgment dismissing the complaint (55 Misc. Rep. 110, 106 N. Y. Supp. 288), pursuant to direction of the court at the close of the evidence on the trial after receiving a verdict on special questions submitted, plaintiff appeals. Affirmed.

See 111 App. Div. 530, 97 N. Y. Supp. 1091.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

Howard Taylor (Henry B. Anderson, on the brief), for appellant. D. Cady Herrick, for respondent.

LAUGHLIN, J. The defendant is a domestic trust company. It was incorporated under the name of the "Trust Company of the Republic" on the 29th day of March, 1902, and its name was changed on the 12th day of October, 1903. The action is brought to recover damages for the breach of a contract in writing, bearing date the 28th day of August, 1902, and purporting to have been made by and between the Trust Company of the Republic, as party of the first part, and the plaintiff, as party of the second part. The agreement acknowledges the consideration of $1 moving to the plaintiff from the trust company and "other good and valuable considerations," and then provides as follows:

"Whereas, a selling syndicate, of which Thomas C. Clarke, is named as manager, has been formed to arrange for such sales, and for other purposes, under an agreement providing for the deposit of all of said securities, except those of the party hereto of the second part, with the party hereto of the first part for such purposes, both parties hereto will in good faith, co-operate with the said syndicate in furthering such object, and this agreement is intended to be an aid to same.

"2. The party of the second part agrees that he will deposit with the party of the first part all of his bonds and shares of preferred and common stock of the United States Shipbuilding Company, under the terms and conditions of this agreement, as hereinafter set forth.

"3. The party of the first part will use and dispose of said securities of the party of the second part as in its judgment is necessary to further the purposes of said syndicate, and in so doing will do whatever is necessary to insure equal benefits to the party hereto of the second part pro rata to his holdings of said securities that are enjoyed at any time by the vendors who shall be or become parties to the agreement with said syndicate in connection with the sale and disposition of said securities or the proceeds of sale of same, and it hereby guarantees to the party of the second part the sale of all of his said securities on or before August 25th, 1903, whether through the

efforts of said syndicate or otherwise, and the party of the first part agrees to account to the party of the second part, on or before the 25th day of August, 1903, and that the prices thereof shall be on a basis which will realize to the party of the second part not less than 95 per cent. of the par value of the bonds and 68 per cent. of the par value of the said preferred stock and 25 per cent. of the par value of the said common stock, less brokerage expenses, as hereinafter stated, and the party of the first part hereby agrees to pay to the party of the second part, the interest on the bonds as and when received from the United States Shipbuilding Company, during the period of this agreement; and in case of their sale or any of them during the period of this agreement, and if under such circumstances, it elects to retain the proceeds of the sale of the same, under the provisions hereof, until the final accounting hereunder, the party of the first part agrees to pay to the party of the second part, the accrued interest on such bonds as may be sold, up to the dates of their sale, and also interest on the proceeds of sale of same, at the same rate that the bonds would have earned if same had not been deposited under the terms of this agreement, said payments of interest to be made January 1st, and July 1st, 1903, if this agreement is not sooner terminated, but at its termination at any time payment is to be made in full.

"4. The party of the first part is hereby accorded the exclusive right to sell the said securities of the party of the second part during the period of this agreement.

"5. The party of the first part shall have authority from time to time, and at any time, to pay the usual brokerage and brokers' expenses, if any, in connection with the sale of said securities of the party of the second part.

"6. Said party of the first part shall not be liable for any error of judgment or for any mistake of law or fact, nor shall it be liable for any act or omission while endeavoring in good faith to carry out the purposes hereof according to its judgment, but such exemption of liability shall not affect its liability named in clause 3 hereof. No obligation or liability in addition to those herein expressed shall be implied against the said party of the first part; it being the spirit and intent of this agreement that said securities are deposited as named under a guaranty of sale at not less than the minimum figures hereinbefore mentioned, and all proceeds of sales are to be accounted for at the figures at which such sales shall be made, and the same with all incidental net profits in connection with the same.

"7. This agreement and all it contains shall become null and void on August 25, 1903, or at any time prior thereto coincident with the sale of and settlement for all of the said securities of the party of the second part or the termination of the said syndicate by the fulfillment of its agreement with the other vendors and underwriters of the said securities."

The agreement is signed "Trust Company of the Republic, by James Duane Livingston, Vice President," and the seal of the company is attached and is attested by W. Babcock both as secretary and as witness. He was not in fact secretary, but was assistant secretary. The plaintiff duly tendered the securities specified in the contract to Livingston, the vice president of the trust company, and by his direction retained them until such time as they might be called for by the trust company. They were neither called for nor sold by the trust company on or prior to the 25th day of August, 1903. The plaintiff, by his original complaint, sought to recover the minimum price for which, by the agreement, the trust company obligated itself to sell the securities. On an appeal by the defendant from an interlocutory judgment sustaining plaintiff's demurrers to various affirmative defenses set forth in its amended answer, this court held that the defendant did not obligate itself by the agreement to pay the plaintiff a certain sum of money, but that the defendant became thereby the selling agent of the plaintiff of the securities mentioned in the

agreement, under a covenant that, if it were given the exclusive right to sell the securities during the period named, they would realize a sum equal to the minimum figures specified in the contract, and that title remained in the plaintiff and without his consent, the defendant could not become the purchaser. Gause v. Commonwealth Trust Co., 100 App. Div. 427, 91 N. Y. Supp. 847. In deciding that appeal, Presiding Justice Van Brunt, writing for the court, said:

"The cause of action, if any, alleged was not a breach of a covenant to pay a certain sum of money, but to perform a certain duty, namely, to sell these securities, and a covenant that they would realize a certain sum at least. There were no allegations whatever contained in this complaint tending to show that by reason of the breach of this covenant of sale, the plaintiff has suffered any damage whatever. It seems to us, therefore, that there being no covenant to pay the sum mentioned in the complaint, and it being the duty of the defendant to sell these securities and to account for the proceeds to the plaintiff, which it covenanted would realize at least a certain sum, whatever right of action the plaintiff has is for a breach of these covenants. We think that the complaint was insufficient, and for that reason the demurrers should have been overruled."

The plaintiff thereafter amended the complaint, and alleged a cause of action on the contract to recover for the difference between the value of the securities on the 25th day of August, 1903, and the price for which the defendant obligated itself to sell them. The defendant demurred to the amended complaint. The demurrer was overruled, and on appeal this court held that the construction of the contract on the former appeal was the law of the case, so far as this court was concerned, and that plaintiff was entitled to recover upon the theory of the amended complaint. 111 App. Div. 530, 97 N. Y. Supp. 1091. The answer of the defendant, among other things, put in issue the making of the contract, and set up, among other defenses, that it was ultra vires, and that a parol collateral agreement was made to the effect that the contract upon which the action is based was not to become operative unless all the other vendors, to whom reference is made in the agreement, signed the syndicate agreement therein mentioned. In support of the defense of a parol collateral agreement, testimony was given by Livingston, the vice president of the defendant, which, however, was controverted by the testimony of the plaintiff. The defendant offered no evidence on the question of damages. At the close of the evidence, by consent of the parties, the court was authorized to assess the damages in the event that the plaintiff should be entitled to recover, and, pending motions by each party for a direction of a verdict, the court submitted two questions to the jury. One was as to whether the officers who signed or directed the signing of the agreement upon which the action is founded were authorized by the defendant to execute it as its corporate act and to affix the corporate seal thereto, and the other was as to whether the alleged parol collateral agreement was made. The jury answered the first question in the affirmative, and the second in the negative. The court thereafter assessed the damages at $362,882, and then granted the defendant's motion to dismiss the complaint. The special finding of the jury that no parol collateral agreement was made is fairly sus-

tained by the evidence, and the plaintiff upon this appeal is entitled to the benefit of the special verdict. Code Civ. Proc. § 1187.

The decision of this appeal involves the consideration of three questions: First, whether the officers who signed the contract were authorized to execute it; second, if so, whether it was ultra vires; and, third, whether the defendant is estopped from questioning the validity of the contract.

I am of opinion that there is no evidence legitimately tending to show that the execution of the contract was authorized by the defendant and requiring the submission of that question to the jury and that the court properly disregarded the special finding of the jury that the execution of the contract was authorized. The learned trial justice wrote a careful instructive opinion in support of his determination to dismiss the complaint, but the importance of the questions requires that we should express our views more at length. The undisputed evidence shows that there was no resolution of the board of directors authorizing the execution of the contract. Section 161 of the banking law (chapter 689, p. 1912, Laws 1892) provides that "the affairs of every such corporation [which includes a trust company] shall be managed and its corporate powers exercised by a board of directors." Section 27 of the stock corporation law (chapter 564, p. 1071, Laws 1890) provides "the directors of a stock corporation may appoint from their number a president and may appoint a secretary, treasurer and other officers, agents and employés who shall respectively have such powers and perform such duties, in the management of the property and affairs of the corporation, subject to the control of the directors, as may be prescribed by them or in the by-laws." Section 5 of article 3 of the by-laws of the defendant provides that the president shall "exercise such general direction as its interests and security may require"; and section 6 of the same article confers authority upon him to affix the corporate seal to certain specified instruments prepared or approved by the counsel or attorney of the company; but it is clear that it does not include such a contract as this, and, moreover, this contract was not prepared by the counsel or attorney of the company. By section 1 of article 4 of the by-laws, the vice presidents are required to perform the duties assigned to them by the executive committee or by the president. It is not claimed that the assistant secretary had any independent authority. The board of directors consisted of 25 members, but at the time in question there was one vacancy. Article 6 of the by-laws provides for an executive committee, to consist of the president and six other directors to be elected by the board, and that a majority should constitute a quorum in the absence of the president, but three should constitute a quorum when he is present. Section 2 of that article provides as follows:

"The executive committee shall exercise all the powers of the board of directors, when the board is not in session, except the power to fill a vacancy in the board. The assent of the executive committee shall be required for all investments that shall be made of the funds of the company in stocks, personal securities and bonds and mortgages, and for the disposition of the same, and of the funds of the special trusts. * * * The executive committee may in its discretion authorize the president generally to make investments in such securities as are authorized by the charter of the company, and

to dispose of such securities without previously consulting, as to the details, with the committee; but all such transactions shall be reported to the committee at its next meeting."

Section 4 of the same article provides that the executive committee shall meet at the main office every Thursday and at other times on call of the president. Article 9 provides that there shall be a regular meeting of the board of directors at the main office of the company on the third Tuesday in every month "to which a report shall be made by the president of the finances, affairs and business of the company." Section 2 of article 15 provides that the seal of the company shall be in the custody of the president "and shall not be affixed to any deed, conveyance or instrument other than those enumerated in article 3, section 6 of these by-laws, unless by the authority of the board or the executive committee, and whenever affixed to any paper it shall be attested by the secretary." There is no evidence that any authority was conferred upon the president, by action of the board of directors or of the executive committee. Authority to make a lease for the main office of the defendant at No. 346 Broadway was conferred on the officers of the defendant by the directors at its first meeting, and it also appears by the minutes of the meeting of the executive committee, held on the 9th day of September, 1902, at which the president and two directors were present, that "a resolution was adopted authorizing the president to make or guarantee loans in the companies name when necessary." It is not claimed that this resolution, if adopted, conferred authority to make the contract in question, which took place as of a prior date. If adopted, it was evidently intended to relate to certain loans that had been made to, or guaranteed by, the company on or about the 11th day of August, 1902, which will be considered presently. One of the directors present testified that the resolution was not adopted. Another was dead, and Dresser, the president, testified that he had no recollection of it; but he admitted that he had testified on the trial of a former action that he had authority to borrow certain moneys, and with respect thereto was given full power to do what he pleased, and that this resolution was adopted to confirm such authority. The resolution, however, on its face, does not relate to past transactions. The contract in question was negotiated between the plaintiff and vice president Livingston, who had charge of the branch office of the defendant at No. 71 William street, and he acted in making the contract under the direction of the president. At the time the negotiations were had and the contract was signed, both Dresser and Livingston were directors of the shipbuilding company, and Livingston was vice president as well. There were interviews and there was correspondence between the plaintiff and Livingston, leading up to the making of the contract which was signed in its final form on the 26th day of September, 1902, as of August 28th; but an agreement had been reached between them, reduced to writing and signed, to substantially the same effect, on the date of the agreement—August 28, 1902. This correspondence was had and kept at the William street branch office; and Livingston testified that he retained the company's duplicates of the contracts, and placed them in the vault in that office,

but that he never communicated any information concerning this contract, or the fact that it had been executed, to the board of directors or the executive committee or to any members thereof, excepting Dresser. Dresser testified that he never informed the board of directors or executive committee or any member thereof with respect to the negotiation for or the execution of this contract. Ten of the 24 directors testified that they never heard of this contract or of any negotiations with respect to it until on or after the 3d day of June, 1903, when a letter was received by the newly elected president of the company from the attorney for the plaintiff with respect to depositing the securities under a plan for the reorganization of the shipbuilding company. It appears that on the 16th day of the same month, after investigation with respect to this contract, the defendant formally repudiated it, and so notified the plaintiff. Both Dresser and Livingston were then out of office, and although Livingston testified that he left the contracts in the vault, it appears that a careful examination was made and they were not found. Three of the other directors were dead at the time of the trial, and seven others were nonresidents. Of the remaining four resident directors, one was ill, and it does not appear that the other three took an active interest in the affairs of the company to give them any special knowledge on this subject.

There is no force in the claim that the board of directors or the executive committee, in effect, failed to exercise their functions, and left the management of the company, at the times in question, in the hands of the president. It appears that the board of directors met regularly in the year 1902, down to the 22d day of July. The meeting in August was adjourned for lack of a quorum, but a meeting was held on the 16th day of September. The executive committee met regularly in the year 1902, down to the 4th day of June, and thereafter the executive committee met on June 17th, June 24th, July 8th, July 22d, September 9th, and September 16th. On the 10th of June a quorum was not present, and it does not appear that there was any attempt to meet on the other dates for regular meetings. This was during the vacation season, and there is nothing to show that the directors had knowledge of any business of the company requiring either a meeting of the board of directors or of the executive committee at the times when meetings were not held. There is nothing in the defendant's connection with the United States Shipbuilding Company, which was organized in June, 1902, from which it could be inferred that implied authority was conferred upon Dresser or Livingston to make the contract with the plaintiff. The Mercantile Trust Company of New York was one of the principal promoters of the shipbuilding company. Prior to the incorporation of the shipbuilding company, which was in June, 1902, there were negotiations between Dresser and Livingston and the Mercantile Trust Company, by which it was understood that on the incorporation of the shipbuilding company the defendant should act:

"(a) As issuing bankers and perform all the duties incidental thereto.
"(b) Advertise prospectus.
"(c) Receive all subscriptions.

"(d) Pay the necessary cash to the trustees to clear the titles and commitments thereto.

"(e) Deliver all bonds and shares to the subscribers.

"(f) Registrar and transfer agent of the shares of the company."

The Mercantile Trust Company was to act as trustee for the bonds of the shipbuilding company, and to perform certain other duties in connection with its affairs after its incorporation.

Thereafter, at the meeting of the board of directors of the defendant, held on the 17th day of June, 1902, Dresser made a report "on the U. S. Shipbuilding consolidation." He testifies that he informed the board, in substance, of his negotiations in this matter, and that the proposition was to have the defendant act as the transfer agent of the stock, as a bank of deposit for the shipbuilding company, to act as the house of issue of the securities that had been or could be submitted to the public for sale, and, in effect, that this was acquiesced in. It appears that the plan of organization of the shipbuilding company contemplated subscriptions here in America for $3,000,000 of the $9,-000,000 of bonds of the shipbuilding company, to be issued in the first instance for the purchase of the constituent plants that were to be transferred to the shipbuilding company, and for expenses and a working capital. Dresser undertook with the mercantile company to obtain subscribers for the $3,000,000 of bonds among the customers of the defendant. Three directors of the defendant became subscribers under the underwriting agreement which was between the Mercantile Trust Company and the subscribers for bonds, but it does not appear that the defendant was a party thereto, or was interested therein. Dresser succeeded in obtaining subscribers for that amount, and afterwards, on a failure of the plan, for obtaining subscriptions for the remainder of the issue in Europe, he obtained subscriptions for about $1,700,000 more. The options which the promoters of the shipbuilding company had for the purchase of the plants to be transferred to it expired on the 11th day of August, 1902. Some of these options ran to Lewis Nixon, and others to Dresser. On or about the 7th day of August, 1902, Dresser was ready to pay over the subscriptions which he had obtained; but on account of the failure of the plans to float the securities abroad he was induced to undertake to obtain subscribers for upwards of $3,000,000 more in order to insure the consummation of the plan. To enable him to accomplish this the Mercantile Trust Company delivered to him the securities, and it appears that they were used with guaranties made by Dresser in the name of the defendant, as collateral to notes made by him and Nixon, and discounted at banks and trust companies with some of which defendant had relations; and it would seem that he also procured the discount of two notes of this defendant aggregating $750,000, using some of these securities as collateral. He thus succeeded in raising the necessary amount, which apparently was deposited with the defendant, for, on August 11th, its checks were used in the disbursement thereof to the vendors of the constituent plants. On the 14th of June, 1902, an advertisement was published in the New York Evening Post, and simultaneously in various other newspapers throughout the country, for subscriptions to the public issue of these bonds, and the name of the defendant ap-

peared thereon as "Transfer Agents" and "Bankers," and it was stated therein that the defendant was authorized to receive applications for the bonds, and that it reserved the right to reject any or all bids, and at the foot of the advertisement was a notice to apply to the defendant and Harris, Gates & Company, Bankers, for additional information. According to the testimony of Dresser, he reported to the board of directors and to the executive committee from time to time concerning the progress of the shipbuilding company matters, but it does not appear that he assumed to do anything that would in any manner involve the defendant financially in the enterprise until about the 11th day of August, 1902, and it appears by his testimony that he did not inform any of the members of the board of directors of his action with respect to borrowing funds in the name of the defendant or on his and Nixon's individual notes or the guaranties thereof. While there is some evidence tending to show that in one or two instances these guaranties were signed "by what purported to be a majority of the executive committee," no such guaranty in writing was produced, and it is fairly to be inferred from the evidence that all of these guaranties were signed either by Dresser or Livingston or by other persons acting under Dresser's direction, and none of whom were directors of the defendant. It appears that early in October some of the other directors acquired information with respect to these loans and guaranties, through the banking department or otherwise, and that the banking department insisted that the defendant should rid itself of these obligations in connection with the shipbuilding securities. The matter was then taken up by the directors, and although they did not recognize Dresser's authority for what had been done in raising funds in the name of the defendant, they apparently deemed it advisable to assume the responsibility, and with that end in view the so-called "Sheldon Syndicate Agreement" was executed on the 29th day of October, 1902, which contemplated raising money by subscription to be used in paying off the notes thus executed by Dresser and Nixon and the defendant and certain other obligations of the defendant for which some of these securities were pledged, and reimbursing the subscribers by a sale of the securities, and in the event of inability to sell them turning the securities over to the subscribers. Prior to this date, the defendant had taken none of the securities of the shipbuilding company as a "house of issue," but on this date title to the securities was formally transferred to the defendant for the purpose of transferring the securities to the managers of the Sheldon Syndicate agreement with a view to carrying out the plan of that agreement, which was done. Funds were thus raised with which the notes and obligations in question were paid and the securities released.

The learned counsel for the appellant contends that these transactions show a recognition of the authority of Dresser to deal in the matter of shipbuilding securities without limitation or restraint. I am of opinion that they do not. They of course show a ratification of the particular acts involved, but they do not aid the plaintiff. The contract upon which the plaintiff seeks to recover is quite different. No knowledge that any directors possessed could have led a reasonable

man to believe that the making of such an agreement as that made with the plaintiff would be incident to the business relations which were outlined by Dresser to the board of directors of the defendant as intended to be established between the defendant and the shipbuilding company. At the time the agreement with the plaintiff was made, the defendant owned none of the shipbuilding securities. At most, assuming it to have authorized all of Dresser's other acts in connection therewith, it was interested in those securities only to the extent that it held them as collateral. It may be that its interest was such that with a view to maintaining the market price of the securities, it would have been competent for the board of directors to have authorized this agreement. It is, however, unnecessary to decide that question, for it is quite clear, I think, not only that it never authorized the agreement, but that the plaintiff was not justified in assuming that the execution of that agreement was within the general authority of the president of the defendant or of those who signed. Even if it were competent for the defendant to make the agreement, it was apparently so foreign to the business of the defendant, and of such an extraordinary nature, that the plaintiff was put upon notice as to the authority of those executing the agreement.

The seal of the defendant was attached to the agreement, and that constituted prima facie evidence that the agreement was signed by authority. Quackenboss v. Globe & R. F. Ins. Co., 177 N. Y. 71, 69 N. E. 223. But as already indicated, the evidence introduced by the defendant completely overcame that presumption. Parties dealing with a business corporation as distinguished from religious and other corporations may rely on the apparent authority of the officers (Karsch v. Pottier & Stymus Mfg. Co., 82 App. Div. 230, 81 N. Y. Supp. 782); but in the absence of evidence upon which estoppel may be predicated, as by holding out as authorized or a course of dealing, the question in all cases still is whether the contract was authorized, and when it appears that it was not, and that there has been no estoppel, that becomes a complete defense. The rights of stockholders must not be entirely overlooked. Stockholders are powerless to protect their interests by electing competent directors if the officers thus elected or appointed by the directors may, without the knowledge or consent of the latter, secretly make important contracts, like this, which are not within their apparent scope or authority, for they are not within the ordinary business of the corporation. The defense that the contract was unauthorized must therefore be sustained as matter of law.

The plaintiff doubtless supposed that the contract was authorized. It appears that he remained ready to perform, and he invokes estoppel against repudiation of the contract by the defendant. The defendant in fact received no benefit from the contract. It is urged, however, that he derived the benefit contemplated of having plaintiff's securities kept off the market. The difficulty with that contention is that it was an unconscious or involuntary benefit at most, because the defendant as a corporation had no knowledge of the making of the contract. The only ground for making the contract or explanation of the conduct of Dresser and Livingston in keeping it secret from the company, in-

dicated by the record, is their interest in the success of the shipbuilding company, and fear that it would not be authorized or ratified by the defendant. The case of Vought v. Eastern Building & Loan Ass'n, 172 N. Y. 508, 64 N. E. 496, 92 Am. St. Rep. 761, is not in point. There, the corporation, after actually and knowingly receiving the benefit of the contract, was held estopped from pleading that the contract was ultra vires.

It follows, therefore, that the judgment should be affirmed, with costs.

PATTERSON, P. J., and SCOTT, J., concur.

INGRAHAM, J. (dissenting). The court submitted two questions to the jury. The first was: "Were the officers who signed or directed the signing of the alleged agreement—that is, the agreement in suit here—authorized by the defendant corporation to execute it as its corporate act and to affix thereto its corporate seal?"—to which the jury answered, "Yes." The other question was as to a question of fact raised by the evidence and is not important. After the jury had answered these questions, and the amount due to the plaintiff had been determined, the court dismissed the complaint. Mr. Justice LAUGHLIN is of the opinion that there was no evidence to justify the submission of this question to the jury, and that is the important question on this appeal.

The instrument was executed at the office of the trust company; it was signed by one of the defendant's vice presidents, by direction of the president in the name of the trust company; the seal of the trust company was placed upon it by one of the assistant secretaries, who signed it as secretary of the company; and it was then delivered to the plaintiff, who relied upon it and acted upon it. At the time this agreement was executed the plaintiff was the owner of 240 bonds of the United States Shipbuilding Company of $1,000 each; 1,916 shares of the preferred stock of the corporation of the par value of $100 each; and 1,916 shares of the common stock of the corporation of the par value of $100 each—the total par value of these securities being $623,200. These securities were held by the defendant during the life of the contract without notice from the defendant that it would not recognize the contract. That the company has received the benefits that it expected to receive by reason of its execution of this contract with the plaintiff is not disputed. That the plaintiff from relying upon the promise contained in this contract has sustained a very serious loss is clear, and to now refuse to enforce the contract against the defendant because of a claimed lack of authority of its officer to execute it seems to me an act of gross injustice to the plaintiff, which would only be justified in case the lack of authority is so apparent that the plaintiff was not justified in acting on the assumption that the acts of the officers of the defendant were authorized. Here was a corporation organized to do business for private gain. It appointed its executive officers to represent it, make contracts for it, and transact its business. Such officers in the usual course of business made a contract with the plaintiff, of which the plaintiff

has received the consideration, and it will not do to say that that contract will not be enforced because of some provision of the by-law under which the president was not authorized to execute it. There is nothing to limit the power of the president to make such a contract. That he did, acting for the defendant, make the contract with the plaintiff is not disputed. The defendant received the benefit from its contract, and the plaintiff has lost the right to dispose of his securities until they have become of no value, and it seems to me that the defendant should be held to its contract.

Before considering the contract it will be useful to call to mind the situation of the defendant in reference to the securities in relation to which the contract in question was made. Some time early in the year 1902 a corporation was organized known as the "United States Shipbuilding Company" with a very large capital, which was intended to purchase the various shipbuilding establishments in the United States and consolidate them into one corporation. Early in May the president of the defendant had entered into relations with those engaged in organizing this shipbuilding company and had made an agreement which secured to the defendant trust company the transfer agency of the shipbuilding company, and by which it was to be a depository of its funds. On the 27th of June, 1902, the president of the corporation reported to the directors that the defendant had been appointed transfer agent of the stock of the United States Shipbuilding Company, which was to be formed, and would also be made the banking or fiscal agent to receive subscriptions for the bonds of the company, and this announcement was received with approbation by the directors. As time went on it became necessary, in order to carry out the scheme of these organizers of this company, to secure subscriptions to its securities, and what are called "underwriting syndicates" were organized, through which it was expected the securities of the shipbuilding company would be sold, and the necessary money to carry out the organization of the company proceeded. The promoters of this scheme expected to have subscriptions to the securities from England, France, and America. The English subscriptions did not materialize. The promoters, however, considered that the French subscriptions would be paid. As the time for the payments required to be made by the shipbuilding company to the other companies approached, some provision must be made to secure the money necessary to make the payments. About August 11, 1902, the president of the defendant and the officers of the shipbuilding company made notes amounting to more than $4,000,000 secured by securities of the shipbuilding company which they procured the defendant to guarantee, and upon which money was advanced by several financial institutions in New York, which was used to carry out the obligation of the shipbuilding company. It would also seem that the defendant had become responsible for other obligations of this shipbuilding company, and certainly a collapse of the new company would cause the defendant to lose a very large sum of money, as well as all the benefits that it had expected from its employment as transfer and fiscal agent. On September 9, 1902, there was a meeting of the ex-

ecutive committee of the defendant, at which a report was made in relation to the situation of these companies, and a resolution was passed authorizing the president of the defendant to make or guarantee loans in the company's name, when necessary. This plainly had relation to loans that had been or were to be guaranteed by the trust company to provide money to carry out this shipbuilding project. The connection of the trust company with this shipbuilding company was largely advertised in the newspapers, and it seems established that the officers and directors of this company knew of the relations which this company bore to the shipbuilding company, and that it was expected that a large and profitable business would result in consequence of such connection.

The president of the defendant testified that at every meeting of the board of directors and of the executive committee, at which he was present during the summer and fall of 1902, he advised the directors and executive committee in relation to the shipbuilding company; that he was trying to keep them informed of the general progress of the project and of what the situation was as it went on from time to time. There was certainly evidence from which the jury could find that both the directors and the executive committee had knowledge of the relations between the trust company and the shipbuilding company; had knowledge of the obligations that the defendant had assumed in order to successfully carry through the promotion of the shipbuilding company; that this was approved by the directors and the executive committee as a transaction for the benefit of the trust company, and to enable it to secure this very profitable connection; that this relation between the trust company and the shipbuilding company had been widely published with the knowledge of the directors, and persons dealing with the trust company were justified in relying upon the well-known relation; and that what was being done by the defendant in promoting this shipbuilding company was done with the authority and assent of its directors.

Prior to the year 1902 the plaintiff had been the owner of something more than one-half the capital stock of the Harlan & Hollingsworth Company, a shipbuilding company which it was considered essential for this new shipbuilding company that the defendant was promoting to acquire. Some time in 1902 efforts were made to induce the plaintiff to sell his stock, and as all of the stockholders of the new company had entered into an agreement to pool their securities with the exception of the Harlan & Hollingsworth Company, the president of the defendant instructed the vice president to go to Wilmington to see the various people who held stock in the Harlan & Hollingsworth Company, at the same time handing him a contract under which the other stockholders of the new company had pooled their stock. The vice president of the defendant went to Wilmington, and saw the plaintiff and others interested. At that time the vice president of the defendant showed the plaintiff this pooling agreement, stated that it was essential that all of the stockholders of the new company should go into this pooling arrangement, and requested the plaintiff to sign the agreement. Plaintiff said that he did not know the Mr. Clarke named in

the pooling agreement, but he expressed a willingness to enter into some such arrangement of that kind if the trust company was a party to it, because he considered that the trust company was responsible. After this interview the vice president returned to New York, and reported to the president of the defendant as to what he had done and what plaintiff had said. Subsequently, the plaintiff came to New York, and, after interviews with the officers of the defendant, finally prepared a contract that he was willing to sign. After that contract was submitted to the defendant the vice president again, under directions of the president, went to Wilmington to see the plaintiff. The president of the defendant did not wish to sign such a contract, but all the other contracts in relation to this pooling agreement were conditional upon all the vendors going into it. After all the other vendors had signed the pooling agreement, the president of the defendant came to an agreement with the plaintiff on behalf of the defendant. There was considerable negotiations in relation to the form of this contract which continued both personally and by letter during the month of September, and the contract was finally executed on the 26th of September, 1902, although dated the 28th of August, 1902. An analysis of the contract is necessary to enable us to determine the questions presented.

The contract is between the Trust Company of the Republic, a corporation organized under the laws of the state of New York, party of the first part, and Harry T. Gause of Wilmington, Del., party of the second part. It recites that it is the mutual desire of the parties thereto that the securities of the United States Shipbuilding Company should be sold to the best advantage, both parties being interested in same; and that a selling syndicate of which Thomas C. Clarke has been named as manager, has been formed to arrange for such sales and for other purposes, under an agreement providing for the deposit of all of said securities except those of the plaintiff with the defendant trust company. It was agreed that both parties to the agreement would in good faith co-operate with the said syndicate in furthering such object, and that the agreement was intended to be an aid to the same; that the plaintiff agreed that he would deposit with the defendant all his bonds and shares of preferred and common stock of the United States Shipbuilding Company under the terms and conditions of this agreement; that the defendant should use and dispose of the said securities of the plaintiff as in its judgment is necessary to further the purposes of said syndicate, and in so doing will do whatever is necessary to insure equal benefits to the plaintiff "pro rata to his holdings of said securities that are enjoyed at any time by the vendors who shall be or become parties to the agreement with said syndicate in connection with the sale and disposition of said securities or the proceeds of sale of same, and it hereby guarantees to the party of the second part the sale of all of his said securities on or before August 25th, 1903, whether through the efforts of said syndicate or otherwise, and the party of the first part agrees to account to the party of the second part on or before the 25th day of August, 1903, and that the prices thereof shall be on a basis which will realize to the party of the second part not less than 95 per cent. of the par value of the bonds and 68 per cent.

of the par value of the said preferred stock and 25 per cent. of the par value of the said common stock, less brokerage expenses, as hereinafter stated, and the party of the first part hereby agrees to pay to the party of the second part, the interest on the bonds as and when received from the United States Shipbuilding Company, during the period of this agreement;" that the defendant was accorded the exclusive right to sell the said securities of the plaintiff during the period of the agreement; that no obligation or liability in addition to those herein expressed shall be implied against the defendant, "it being the spirit and intent of this agreement that said securities are deposited as named under a guaranty of sale at not less than the minimum figures hereinbefore mentioned, and all proceeds of sale are to be accounted for at the figures at which such sales shall be made, and the same with all incidental net profits in connection with the same."

What was intended by this agreement seems to be quite plain. It recited that the trust company was interested in the successful carrying out of the syndicate agreement with whom all of the stocks and bonds of this shipbuilding company had been deposited except those owned by the plaintiff, and the proofs show it has assumed large obligations, which were secured by the like securities. The defendant considered it essential to the successful disposition of these securities that the plaintiff's bonds and stocks should be added to those to be sold by the syndicate. By the acquisition of the plaintiff's securities defendant had in its possession all of the securities of the shipbuilding company, and thus acquired complete control of the issues; and, to accomplish this, defendant was willing to guarantee that the plaintiff's stocks and bonds would be sold at the prices named within the period specified, or, in default of a sale before that time, to account to the plaintiff for the securities at a price specified. If the securities had not been sold, and the defendant had paid the plaintiff the amount named, which was all it was obliged to do, the defendant would have been the owner of these securities, and could have made such disposition of them as it chose. There was no arrangement by which these securities were to ever be returned to the plaintiff, and after their deposit with the defendant the sole interest of the plaintiff in these securities was the obligation of the defendant to account to him for them at the prices specified. This, it seems to me, was the obvious intent of the parties to this agreement. There is nothing here that guaranteed the payment of an indebtedness or obligation of a third party, and the use of the word "guarantee" is misleading. It was the defendant who was to have charge of the sale of the securities, and it was the defendant who was to reap the benefit which would accrue by reason of the deposit with the defendant of the securities, and it was that benefit which was considered by the officers of the defendant as important for the defendant, and that formed the consideration for the undertaking to so manage the time and place of sale as to secure to the plaintiff at least the amount specified in the agreement.

The plaintiff was not told, and had no right to inquire, as to the interest of the defendant in the securities, or in the successful disposition of them. He made his agreement with the responsible officers of

the company. He saw the contract to which the parties had agreed executed by the responsible officer of the company, with the seal of the company affixed, and delivered to him, and he has complied with it. Before discussing the question as to the authority of the officers of the defendant to execute such agreement, it will be well to consider briefly the question of ultra vires.

The defendant was organized under the banking law (chapter 689, p. 1842, of the Laws of 1892). By section 156 (page 1908) of that act it had power to act as the fiscal or transfer agent of any corporation, and in such capacity to receive and disburse money, transfer, register, and countersign certificates of stock, bonds, or other evidence of indebtedness; to take, accept, and execute any and all such trusts and powers of whatever nature and description as may be conferred upon, intrusted, or committed to it by any person or persons or anybody politic, corporation, or other authority; to purchase, invest in, and sell stocks, bills of exchange, bonds, mortgages, and other securities, and when moneys or securities for money are borrowed or received on deposit or for investment the bonds or obligations of the company may be given therefor. And under sections 55 and 56 (pages 1869, 1870) of the same act general banking powers were conferred upon trust companies, and the defendant had, by implication, all incidental powers necessary to carry out the general and express powers conferred upon it. By the by-laws of the company the president was to preside at all meetings of the directors, and was ex officio a member of the executive committee. He was authorized to take charge of, and keep under his control, all the stocks and personal securities of every description owned by the company; directed at all times, and on all occasions, to exercise such general direction and supervision over all the affairs of the company as its interest and security may require. The president was also given power to affix the corporate seal of the company to various instruments specified in the by-laws. The vice presidents were authorized to perform such duties as may be from time to time determined by the executive committee, and also such as may be assigned to them by the president. It was also provided that the executive committee should exercise all the power of the board of directors when the board was not in session, and that the executive committee may, in its discretion, authorize the president generally to make investments in such securities as are authorized by the charter of the company.

The defendant, thus being expressly authorized by the statute under which it was incorporated, to act as fiscal or transfer agent of any corporation, and to receive and disburse money, transfer, register, and countersign certificates of stock, bonds, or other evidence of indebtedness, and to take, accept, and execute any and all such trusts and powers of whatever nature and description as may be conferred upon it, would certainly have authority to make such reasonable contracts as were essential to obtain such business or to carry it on. It had general banking powers, power to loan money, to purchase and sell stocks and other securities; and it seems to me that the corporation clearly had authority to make a contract such as the one now before us if it related

to or tended to facilitate the defendant in making the arrangements for the business that it was expressly authorized to do. If this contract had been in form a contract to purchase the st ck of this shipbuilding company within a time specified, there would have been no question but that the company would have had power to execute it. The fact that it gave the company either the option to sell it to somebody else, or to purchase it itself, does not, it seems to me, change the essential character of the agreement, and it seems to me that the contract was one clearly within the power of the corporation to execute; but if there was any question as to the power of the corporation, under the rule as established in this state, the defense of ultra vires is not open to the defendant. As before stated, the plaintiff has executed the contract on his part, and of the execution of that contract by the plaintiff the defendant has received the full benefit. It was enabled in the month of October to relieve itself of liability for upwards of $4,000,000 of securities by an agreement for the sale of these shipbuilding securities, and the plaintiff was, by this contract with the defendant, prevented from availing himself of that opportunity to dispose of his securities at that time. The contract has, therefore, been fully performed on the part of the plaintiff. He made no effort to sell his securities, and could not, without breach of his contract with the defendant.

There can be no question but that if this shipbuilding company was successfully started there would result a valuable connection for the defendant. The president had from time to time reported to the directors the arrangements that he had made for that purpose, and neither the directors nor the executive committee had ever objected to or disapproved of the arrangements that he had made. The successful establishment of the company depended upon the sale or disposition of the shipbuilding company's securities, and it was for this purpose that the president and other officers of the defendant made the various contracts which have been indicated. The defendant had guaranteed loans to the amount of over $4,000,000 upon the securities of this company, and it is apparent that the throwing upon the market at that time of a large amount of securities of the company would necessarily have depreciated their value, impaired the security of these loans, and exposed the defendant to a claim under its guaranty. Under these circumstances, the president of the defendant solicited the plaintiff to make this contract. It was made for the benefit of the defendant, and at the solicitation of its president and other officers. After it was executed it was placed by the defendant in its vault with the other securities, and remained there until the spring of 1903. During all that time there was not the slightest objection or notice that it would not be complied with, or that it was ultra vires or unauthorized. It seems to me that, under such circumstances, the corporation having power to purchase securities and make the incidental contracts necessary to conduct its business, this contract was not, under the rules as established in this state, ultra vires.

In Whitney Arms Co. v. Barlow, 63 N. Y. 62, 20 Am. Rep. 504, the rule of this state as to an ultra vires contract was formulated, which has not since been departed from. The rule is there stated:

"It is now very well settled that a corporation cannot avail itself of the defense of ultra vires when the contract has been in good faith fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract."

This principle has since been followed in Kent v. Quicksilver Mining Co., 78 N. Y. 159; The Rider Life Raft Co. v. Roach, 97 N. Y. 378; Vought v. Eastern Building & Loan Ass'n, 172 N. Y. 508, 65 N. E. 496, 92 Am. St. Rep. 761; and Bowers v. Ocean Accident & Guarantee Corp., Ltd., 110 App. Div. 691, 97 N. Y. Supp. 485, affirmed by the Court of Appeals 187 N. Y. 561, 80 N. E. 1105. This contract, therefore, not being ultra vires, or at any rate the defense of ultra vires not being available to the defendant, we come back to the question as to whether, upon this evidence, a finding of the jury that its officers had authority to execute the contract or affix the seal of the company thereto was without evidence to support it.

The evidence clearly shows a constant course of dealing by the president of this corporation without express reference to or authority from either the board of directors or the executive committee. There are a series of contracts made by the president on its behalf, guaranteeing loans, and making contracts in relation to this shipbuilding company, of which the contract with the plaintiff is one. They were made as carrying out the general arrangement in relation to this shipbuilding company that had been reported to the directors and had received its acquiescence. So far as appears, these contracts and obligations were all carried out and performed, except the contract with the plaintiff. The relation of this defendant to the shipbuilding company's securities was advertised in the newspapers, and was apparently well known to everybody except these directors, who now claim that all this was done without their knowledge. But without objection, the president of this corporation was allowed to make this contract, giving to the defendant a decided advantage, which it availed itself of, and without the slightest notice to the plaintiff that the contract had been made without its authority the plaintiff was prevented from protecting himself by his obligations to the defendant under this contract. It seems to me, under these circumstances, where the plaintiff has fully carried out the contract, relying upon the authority of the president of the defendant to make this contract, without the slightest notice that such authority did not exist, that the defendant is estopped from disputing his authority. People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907.

In Holmes v. Willard, 125 N. Y. 75, 25 N. E. 1083, the question of the ultra vires of a contract and the authority of an executive officer of a corporation to execute it were discussed by the court, and certain principles were established which, it seems to me, apply to this case. It was there said:

"While the plaintiff did not have the right under its charter to carry on this business, it had capacity to do so, and could make contracts therein which would bind it and the persons with whom it dealt, and its acts therein could be regarded as corporate acts."

The evidence is undisputed that this contract, being one within the general powers of the corporation to make, was duly signed by its

officers, and its seal duly affixed to it at the office of the company. As was said in Quackenboss v. Globe & R. F. Ins. Co., 177 N. Y. 71, 69 N. E. 223:

"It is an ancient and well-established rule of law that where the seal of a corporation is affixed to a contract or written instrument, to which such corporation is a party, and it is signed by the president and secretary or other proper officers, it will be presumed that such officers did not exceed their powers, as the seal is prima facie proof that it was attached by proper authority, and it lies with the party objecting to its execution to show that it was affixed surreptitiously or improperly."

We have, therefore, a presumption from the formal and notorious execution of the instrument at the office of the company, by the officers of the company, which has been performed by the plaintiff, and the advantage of such performance had been appropriated by the corporation, without notice to the plaintiff of any lack of authority on the part of its officers to execute the agreement. It seems to me that, from this evidence, there was at least a question of fact presented as to whether this contract was authorized by the defendant, and which justified the finding of the jury. It is quite immaterial to say that the directors had no knowledge of this agreement. It was made for its benefit by its principal executive officers. The original contract was put with its other records and preserved. The corporation itself is, I think, chargeable with notice of the execution of such contract, and it certainly cannot go on and allow a person openly and notoriously dealing with it to rely upon his contract with such a corporation, obtaining the benefit of the contract, without at least raising a question of fact as to either the original authority on behalf of the officers of the corporation to execute the contract, or a ratification of the act of the corporation in executing it. The evidence adduced by the defendant to show that the directors or executive committee had no knowledge of this contract is extremely indefinite, and assuming that, if neither the executive committee nor the board of directors had expressly authorized this contract, it could not be enforced, the testimony in relation to it would do no more than raise a question of fact for the jury, which the verdict of the jury has settled in favor of the plaintiff. New Eng. Iron Co. v. Gilbert El. R. Co., 91 N. Y. 153–164. In Jourdan v. L. I. R. Co., 115 N. Y. 380, 22 N. E. 153, a contract was drafted in pursuance of negotiations between the two companies. An emergency arose which called for its completion, and the secretary, after consulting with the president, signed, sealed, and delivered it, expecting, as he testified, to get a ratification, intending to call the board of directors' attention to it, but forgot it. The Court of Appeals held that this raised a question for the jury as to the authority to execute the instrument, and that the facts, which were not nearly so strong as in the case at bar, were "abundant and conclusive evidence that the contract was adopted and ratified by the defendant in its corporate capacity." It was there said:

"Moreover, the defendant received a pecuniary benefit under the contract, upon the assumption that the contract was valid. If they intended to disavow it, it was their duty to be active in so doing, and not remain willfully passive, in order to profit by an omission or mistake on the part of their own

officers, and which they might have prevented." See, also, Fifth Nat. Bank of Prov. v. Navassa Phosphate Co., 119 N. Y. 256, 23 N. E. 737.

In view of these authorities, and in view of the undisputed testimony that the acts of Dresser as president of the defendant, in making arrangements to secure the business of this shipbuilding company, were approved by the directors and executive committee, and he was allowed to make such contracts, borrow money, guarantee notes and other obligations, all of which were either expressly authorized or ratified by the company, it is difficult to see how it can be seriously contended that there was not at least a question for the jury as to whether or not these officers of the defendant had authority to execute this contract, or whether their action in executing it was not subsequently ratified by the corporation.

I think that this contract was not ultra vires; that the finding of the jury that the defendant authorized its execution was sustained by the evidence; and that the plaintiff, and not the defendant, was entitled to judgment upon the verdict of the jury.

I think, therefore, that the judgment should be reversed, and judgment ordered for the plaintiff upon the verdict, with costs to the plaintiff.

CLARKE, J., concurs.