BAUERSMITH v. EXTREME GOLD MIN. & MILL. CO.

(Circuit Court, W. D. Pennsylvania. June 20, 1906.)

No. 29.

1. CORPORATIONS—UNAUTHORIZED CONTRACT BY OFFICER—RATIFICATION BY ACCEPTANCE OF BENEFITS.

Plaintiff entered into a written contract with the secretary of defendant corporation, made in its name, by which he agreed to undertake the sale of its stock on commission. The secretary was without authority to make such contract, but the officers and directors were aware that plaintiff was holding himself out as the company's agent, and assuming to act for it in making sales, and, in addition to their knowledge of sales made and attempted to be made by him, they accepted by formal resolution a proposition secured by him for the purchase of a large block of stock. *Held*, that such acceptance was a ratification of the contract, whether or not they knew its terms, which they could not afterwards avoid by an attempted repudiation, and which entitled plaintiff to the stipulated commission on the sale.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, §§ 1713, 1714.]

2. BROKERS—COMMISSION ON SALE OF STOCKS—ACQUIESCENCE IN REDUCTION OF AMOUNT OF SALE.

Where a broker made a contract on behalf of a corporation for a sale of its stock, on which he was to receive a commission, but on account of difficulty in collecting the price a compromise was made with the purchaser, by which he took and paid for a smaller amount, in which the broker took part, and to which he did not at the time object, he was entitled to commission only on the amount of the actual sale.

On Rule for Judgment in Favor of Defendant Non Obstante Veredicto on Reserved Point. Also rule for new trial.

H. J. McAllister and E. L. Grantham, for the rules.
William M. Hall, for plaintiff.

ARCHBALD, District Judge.* The plaintiff, a Pittsburg broker, sues to recover commissions on the sale of certain stock of the defendant company. There was a verdict in his favor, which was taken subject to the point reserved whether there was any evidence on which he was entitled to recover, and the defendants now move for judgment non obstante veredicto upon it. The action is based on an agreement in writing, which was executed in the name and on behalf of the defendant company by W. H. Chambers, its secretary, by whom the arrangement with the plaintiff was made. That Dr. Chambers had no authority to enter into the agreement is practically conceded, he himself so testifying, as well as the other directors, and the by-laws also standing in the way. It is claimed, however, that the agreement was subsequently ratified, the company acting upon and accepting benefits under it, and it is on this that the right of the plaintiff to recover depends.

The Extreme Gold Mining & Milling Company is a South Dakota corporation, but its affairs at the time of this transaction were in the hands of parties residing in the vicinity of Pittsburg; Dr. J. Y. Scott being president, W. J. Andrews, treasurer, Dr. Chambers, secretary,

*Specially assigned.

and E. R. McClure, a director. That all of these gentlemen knew at an early day that the plaintiff was engaged in trying to make sale of the company's stock, there can be no question. Not only was the name of the company put up on the door of his office in Pittsburg, which they are shown to have visited, but letterheads were printed, and an elaborate prospectus got up and copyrighted, on which his name was prominently displayed as fiscal agent; all of which, sooner or later, came under their notice. In the latter part of June, also, soon after the agreement was executed, the plaintiff and his assistant, Mr. Houghton, went to Washington, Pa., where Dr. Scott, the president, lived, and obtained from him a letter recommending the stock to a druggist whom he knew in Pittsburg, for the purpose of enabling them to make sale, if possible, to him; and while it is true that Dr. Scott says he thought it was Dr. Chambers' stock that was being sold, this is disputed, and in the present consideration the evidence favorable to the plaintiff must be taken. But, whatever controversy there may be as to this transaction, there can be none as to the one following, for on August 11th the plaintiff, through Houghton, having secured H. C. Whitaker, of Wheeling, W. Va., as a prospective purchaser, and having taken him out to South Dakota to see the company's property, a proposition was submitted to the company, which was accepted by due resolution, to sell him 25,000 shares, at 75 cents a share, for which he was to pay $10,000 in cash, and the balance by note to the company at one year. To assist in carrying through this sale, an effort was made by Dr. Scott, at the instance of the plaintiff, to secure a loan of $10,000 for Mr. Whitaker at some of the Washington banks, but without success. Soon after this, the plaintiff, having been furnished by Dr. Chambers with a certificate of stock made out to Mr. Whitaker, delivered it to him on his promise to make the down payment in a few days. This he failed to do, and the matter lingered along; the plaintiff by much insistence finally getting two payments of $500 each—one in September and the other in October—which he retained on account of his commissions. On November 15th, however, by the efforts of Dr. Chambers, Mr. Whitaker gave a 10-day note for $10,000, payable to the order of the company. This was put in bank for collection, but by mistake was sent to Washington, Pa., instead of Wheeling, and was there protested for nonpayment; and, nothing outside of this being done by Whitaker to meet it, steps were thereupon taken to enforce the purchase. After consultation between the plaintiff and the officers of the company, an attorney was employed at Wheeling, and one or more interviews had with Mr. Whitaker there, at which he finally proposed that his subscription for 25,000 shares should be canceled, and that in place of it he would pay $10,000 in cash, and take a correspondingly reduced amount of stock, which was agreed to. In accordance with this arrangement, after deducting the $1,000 paid to the plaintiff, he gave a draft for $9,000, surrendered the certificate for 25,000 shares which he had received, and took a new one for 13,333⅓; the company, through Dr. Chambers, executing a release under seal for the balance. The plaintiff testifies that he did not agree to let Whitaker off in this way, on the strength of which he has claimed, and the

jury have allowed him, full commissions, as though the·sale had gone through for the 25,000 shares. There was evidence, also, that, upon being appealed to by the plaintiff by long distance telephone, when the negotiations ·for a settlement with Whitaker were in progress, Dr. Scott declared that Dr. Chambers was not authorized to take anything less than the full amount, and that the company proposed to hold to the deal as it had been originally made. The settlement with Whitaker was December 21, 1904. Soon after that, Dr. Chambers says, he went to Washington to turn over the money, and have the stock which he had delivered reimbursed to him out of the stock in the treasury, but that the company refused to accede to this. Dr. Scott says that the deal fell through, and that no money was brought in, and no request made for a certificate. There is evidence outside of both that Dr. Chambers held on to the $9,000 with the idea of getting the benefit of the transaction for himself and making it his own, and that the other directors took umbrage at this, feeling that he was not treating the company right in doing so. It was about this time that the plaintiff had a talk with Dr. Scott, in which, for the first time, he informed him that his commissions were to be 25 per cent.; Dr. Scott, in reply, stating that those which the company were allowing would warrant paying him as much as 37½, in conformity with which, he, McClure, and Andrews, acting on behalf of the company, by letter of January 14, 1905, put a block of 50,000 shares of treasury stock in the plaintiff's hands to dispose of on these terms. In addition to the sale to Whitaker, as well as several other unsuccessful efforts with others, which the directors, one or more, knew about, the plaintiff effected a further sale in September, 1904, of 666⅔ shares to a man named Dietrich in Philadelphia for $500. For this two notes of $250 each were given, made payable to the company, which were turned over to Dr. Chambers as secretary, and subsequently paid. The stock to complete this transaction, the same as in the sale to Whitaker, was supplied by Dr. Chambers; being ·transferred, as shown by the stock certificate book, from the shares standing in his individual name.

This brings us to the resolution of February 10, 1905, on which both parties in a measure rely. By the minutes of a meeting of the directors of the defendant company of that day, it appears that Dr. Chambers made two alternative propositions, based upon the transactions detailed above, in substance as follows: Reciting that, having undertaken the sale of treasury stock, he had expended large sums in advertising the property, in taking parties to investigate it, and in securing prospective purchasers, and for the purpose of effecting sales had contracted with the plaintiff in the name of the company; being compelled, however, by reason of the latter's· unfaithfulness, to advance various sums, and $1,000 having been received and kept by the plaintiff out of the proceeds of a sale, of which a settlement and compromise had been effected by the delivery of 14,000 shares of his own individual stock, he thereupon proposed: (1) That the company reimburse him for·all expenses incurred in the premises, assuming the attendant obligations, and holding him·harmless as agent

of the company, and recognizing and ratifying the contracts which he had made in its behalf; or (2) allowing him to make such contracts and obligations his own, issuing his own individual stock, as he had done, and receiving the proceeds, and assuming the responsibility therefor, he agreed to effect, if possible, a sale of treasury stock of the company to the amount of 14,000 shares, upon the same terms and conditions as contemplated in the sale undertaken as before mentioned; upon the acceptance of which proposition he further agreed to hold the company harmless from all expenses, liability, damage, claim, or demand, by reason of the dealings referred to. The second of these propositions was accepted; the following resolution being passed: Reciting that in his attempted sale of treasury stock Dr. Chambers had incurred large and extraordinary expenses, and to save himself from heavy financial loss had made a compromise and settlement of the same by a delivery of his own individual stock; that no money or proceeds of such sale had been paid or tendered to the company, and no treasury stock issued or demanded, nor any sale thereof made, contracted, or consummated in compliance with the rules of the company; that the company did not desire to assume any responsibility or liability for or upon such sale or settlement, or upon any sales the proceeds of which had not been received by the company; thereupon, expressing confidence in the ability of Dr. Chambers to effect a sale of treasury stock such as he suggested, and relying upon his undertaking to save the company harmless, it was resolved: (1) That the proposition to ratify the attempted sale and settlement be rejected, and that all parties be relieved from any and all liability to the company on account of them; and, further (2) that the offer to sell 14,000 shares of treasury stock be accepted; Dr. Chambers being authorized to bring or defend any action in the name of the company which he might deem proper under his obligation to protect it.

This resolution was prepared by counsel, and was evidently intended to get the benefit of the sales which had been made to Whitaker and Dietrich, without being responsible for them; but in the face of the facts, at least as to the Whitaker sale, it was not competent to do so. By due action taken August 11, 1904, the application of Mr. Whitaker for 25,000 shares had been accepted, and the sale which the plaintiff had solicited was thereby adopted and confirmed. It may be that this was done without direct knowledge of the existence of the writing on which the plaintiff relies, and so without knowledge as to the amount of commissions which he was to get, or the provision with regard to paying for the printing of prospectuses, letterheads, etc. But it certainly was known by the directors that, in seeking to effect this and other sales, he was acting for the company on authority which proceeded from somewhere, and, in accepting the benefit of his services, they necessarily committed themselves to the means by which these services were secured. This is not to impute or presume knowledge; it is not that they might or ought to have known, and are therefore to be held as though they did. Murray v. Nelson Lumber Co., 143 Mass. 250, 9 N. E. 634. But, having taken advan-

tage of what had been done in their behalf, they could not afterwards refuse to be bound thereby—a doctrine which is abundantly sustained by the authorities.   Wheeler & Wilson Mfg. Co. v. Aughey, 144 Pa. 398, 22 Atl. 667, 27 Am. St. Rep. 638; Perry v. Simpson Waterproof Mfg. Co., 37 Conn. 520; Clement Bane & Co. v. Clothing Co., 110 Mich. 458, 68 N. W. 224.   As said by Sharswood, J., in Mundorff v. Wickersham, 63 Pa. 87, 3 Am. Rep. 531:

"Thus, where a party adopts a contract which was entered into without authority, he must adopt it altogether.   He cannot ratify the part which is beneficial to himself, and reject the remainder; he must take the benefit to be derived from the transaction cum onere."

Or, as declared in Scott v. Middletown Railroad, 86 N. Y. 200:

"Where property bought by the president of a railroad without authority was appropriated and used for corporate purposes, it amounted to an adoption and ratification; the directors so using the material being bound to inquire and presumed to know whether it was paid for or not.   It was not essential that they should have actual knowledge of the terms of the contract of purchase; that, for instance, it was made upon the credit of the corporation."

While, then, in the case in hand, Dr. Chambers may have had no authority to bind the company by a written agreement with the plaintiff, as he undertook to do, yet when the board of directors accepted the benefit of the plaintiff's services, which were so secured, as they did when they adopted the sale which he had negotiated with Whitaker, they took upon themselves the obligation to compensate him according to the terms of the agreement under which he acted, whether they knew of its existence or not.   It is not as though he was acting for the purchaser in the transaction, nor as though he were a mere volunteer, and it is idle to suggest that it was supposed Dr. Chambers' stock was being sold.   He acted for the company, and the directors knew it, and the shares which they agreed to sell were those of the company, as the resolution accepting the application conclusively proves.   It was therefore the duty of the directors to inquire and know upon what terms he was acting, and to give timely notice if they did not propose to be bound thereby.   They could not play fast and loose with the plaintiff, appropriating his services, and refusing the compensation stipulated for by which those services were obtained.

It is claimed, however, by the defendants that they got nothing out of the Whitaker sale, and that it was subsequently repudiated and annulled.   But it is not true that they get no benefit from it, and it is not material that it was not carried out to the full extent that it had been made.   Whether it was or not, the plaintiff's services were complete when he secured a responsible purchaser upon terms which were agreeable to the company; and, having once ratified the agreement with him by accepting the benefit of what he had done, they could not throw off the obligation, whether they went on with the sale which he had negotiated or not.   The fact is, however, that by the resolution which was finally adopted, however it may be disguised, and whatever may seem to be its terms, advantage was taken of both the Dietrich and the Whitaker sales, thus unquestionably bind-

ing the company, upon the principle already alluded to, even if not previously bound. The arrangement speciously entered into with Dr. Chambers, by which he apparently undertook the sale of 14,000 shares of treasury stock, was a mere form. He never attempted any such sale, and it was not expected that he would. This was the exact amount of the combined Dietrich and Whitaker sales, as finally consummated, there being $666\frac{2}{3}$ shares of the one, and $13,333\frac{1}{3}$ of the other, and all he did was to turn over the money which had been obtained from them, which in fact already belonged to the company, but which he had kept back; being reimbursed with treasury stock for that which he had taken from his own individual holdings in order to consummate these sales. That at this time the directors knew of the agreement with the plaintiff, which had been entered into by Dr. Chambers, there can be no question; direct reference being made to it in the resolution. In thus taking advantage, mediately or immediately, of the plaintiff's labors, they acted with knowledge, if that be necessary where there has been an acceptance of benefit; so that, even upon that basis, complete liability was made out. There was abundant evidence, therefore, as this review of it will show, to sustain the verdict, and the rule for judgment notwithstanding it must be discharged.

In one respect, however, the verdict is not to my satisfaction. It allows the plaintiff commissions, as though the sale to Whitaker was carried through for the whole 25,000 shares. No doubt, in a measure, these commissions were earned when Mr. Whitaker was secured as a purchaser for that amount upon terms which were acceptable to the company. But difficulty was experienced in enforcing the sale, as we have seen, to which the plaintiff himself contributed when he delivered the stock without getting the down payment which was to have been made. At all events, in the negotiations which followed looking to a settlement, the plaintiff directly participated, and while he now says that he did not consent to the compromise by which the sale was reduced to $13,333\frac{2}{3}$ shares, he made no protest at the time when he was called upon to speak, which is much more significant. It is true that he telephoned to Dr. Scott to see whether Dr. Chambers had authority to settle for less than the whole, which may seem to lend some countenance to his present contention, but he made no objections in the end, and his only complaint in the transactions which immediately followed was that Dr. Chambers did not turn over to the company the draft which Whitaker had given, so that he could get his commissions out of it. Actions speak louder than words, and I am therefore constrained to hold that the evidence of his assent to the settlement with Whitaker is too positive and convincing to be disregarded, and that the jury ought not, in the face of it, to have allowed him commissions to the extent they did.

The rule for judgment in favor of the defendants non obstante veredicto is discharged. The rule for a new trial will also be discharged, upon condition that the plaintiff, within 20 days by paper filed agrees to remit from the verdict all over and above the sum of $1,710.31; or otherwise will be made absolute, and a new trial awarded.