[L. A. No. 2153.    Department One.—January 7, 1909.]

JULIUS R. BLACK et al., Appellants, v. HARRISON
HOME COMPANY (a Corporation), Respondent, and
ED. G. HOOKSTRATTEN et al., Interveners and Ap-
pellants.

CORPORATION—AUTHORITY OF PRESIDENT TO CONTRACT.—The president
of a corporation has no power merely because he is president to
bind it by contract.  The management of the affairs of a corpora-
tion is ordinarily in the hands of its board of directors, and the
president has only such power as has been given him by the by-laws
and the board of directors, and such other power as may arise from
his having assumed and exercised the power in the past within the
apparent consent and acquiescence of the corporation.

ID.—CONTRACT FOR SALE OF LAND—BY-LAWS AUTHORIZING CONTRACTS
APPROVED BY DIRECTORS.—The president of a corporation has no
express authority to execute on behalf of the corporation a contract
for the sale of its real estate under a by-law whereby his power
in regard to contracts of that character was limited to the signing
of such contracts as had first been approved by the directors.  And
a further by-law, to the effect that he should have direction of the
affairs of the corporation, subject to the advice of the directors,
did not enlarge his authority in this regard.

ID.—RESOLUTION AUTHORIZING CONTRACTS EXECUTED BY PRESIDENT AND
SECRETARY.—A resolution of the board of directors of the corpora-
tion authorizing the execution of such contracts jointly by the presi-
dent and secretary, does not give express authority to the president
to execute such a contract in the name of the corporation, without
the joinder of the secretary.

ID.—ESTOPPEL OF CORPORATION — CONTRACT EXECUTED BY PRESIDENT
—OWNERSHIP OF ENTIRE CORPORATE STOCK.—A corporation is not
estopped from denying the binding effect of a contract purporting
to have been executed in its name by its president, on the theory
that such president was the owner of all the stock of the corpora-
tion and really the only person interested therein, when it appears
that a daughter of the president, who had died intestate only two
weeks prior to the contract, without having married and without
issue, was at the time of her death the owner of practically one
half of the stock.  It cannot be assumed that such daughter did not
leave creditors, or that it will not be necessary to sell in due course
of administration of her estate all or some portion of her stock to
pay debts and expenses of administration.

ID.—ACQUIESCENCE BY PRIOR COURSE OF DEALING.—A corporation is
not estopped from denying the binding effect of an unauthorized
contract for the sale of real estate purporting to have been exe-

cuted in its name by its president, on the ground of its acqui-
escence in a similar course of dealing by the president, when the
evidence shows that, aside from the contract in question, the presi-
dent had never previously attempted to execute such a contract in
the name of the corporation, except in the manner prescribed by
the by-laws and the resolution of the board of directors.

ID.—NON-ACCEPTANCE OF BENEFIT UNDER CONTRACT.—Where there was
no acceptance by the corporation of any benefit under such unau-
thorized contract, it is not estopped to deny the binding effect of
the contract on that ground.

ID.—ACCEPTANCE OF DEPOSIT BY UNAUTHORIZED AGENT.—The unauthor-
ized acceptance by one purporting to act as agent of a corporation
of a deposit on account of the purchase price of land of the cor-
poration contracted to be sold under an unauthorized contract of
sale executed by the president, does not estop the corporation from
denying the validity of the contract of sale.

FINDINGS—OMISSION TO FIND WHEN IMMATERIAL ON NEW TRIAL.—The
failure of the trial court to make a finding of fact upon a material
issue renders the decision one against law, and a motion for a new
trial will lie on that ground. But where, in view of the pleadings
and the issues raised thereby, certain findings made necessarily dis-
pose of the case, it is immaterial on an appeal from an order
denying a new trial, whether other findings are sufficiently supported
by the evidence, or whether there are findings upon other issues, or
whether findings in regard to some other issues are conflicting or
unintelligible.

ID.—NEW TRIAL—FAILURE OF FINDINGS TO SUPPORT JUDGMENT.—An
objection that findings do not support the judgment is not available
on motion for a new trial. .

APPEALS from a judgment of the Superior Court of Los
Angeles County and from an order refusing a new trial.
Waldo M. York, Judge.

The facts are stated in the opinion of the court.

Lawler, Allen & Van Dyke, for Plaintiffs and Appellants.

. Calvert Wilson, and Sidney J. Parsons, for Interveners
and Appellants.

Charles L. Batcheller, and Thos. C. Ridgway, for Respond-
ent.

ANGELLOTTI, J.—This action is one originally brought
by plaintiffs to compel specific performance of an alleged
contract for the sale by defendant corporation to plaintiffs

of lots 1 and 2 in block J of the Morris vineyard tract, in the city of Los Angeles. The interveners sought specific performance of another alleged contract for the sale by said defendant to them of the same property. The trial court found that defendant corporation never entered into either of said contracts, and gave judgment for defendant against both plaintiffs and interveners. Plaintiffs appeal from such judgment and from an order denying their motion for a new trial. Interveners appeal only from the order denying their motion for a new trial.

The evidence is practically without conflict.

Defendant corporation was organized by C. G. Harrison in the year 1889, its purposes, as stated in the articles of incorporation, being generally to acquire by gift, purchase, and otherwise, real and personal property, to manage the same, and to sell and dispose of the same. Its original assets consisted entirely of the community property conveyed to it by C. G. Harrison and his wife, Sarah J. Harrison. Its stock was divided into one thousand shares of the par value of one hundred dollars each, and this stock was subscribed for and issued as follows: C. G. Harrison, one share; Sarah J. Harrison, four hundred and ninety-nine shares; Olive M. Harrison, a daughter, four hundred and ninety-eight shares; Lewis G. Harrison, a son, one share; F. H. Pieper, a brother-in-law of Mr. Harrison, one share. At the first meeting of the directors, being the above-named persons, C. G. Harrison was elected president, Mrs. Harrison vice-president, and Olive M. Harrison secretary and treasurer.

The by-laws of the corporation made it the duty of the president to sign all contracts which had first been approved by the directors, authorized him to draw checks of the corporation on banks where the funds thereof were deposited, and gave him direction of the affairs of the corporation, subject to the advice of the directors. It further provided that in the event of his inability to act, the vice-president should take his place and perform his duties. At the first meeting of the board of directors, held in September, 1899, the following resolution was adopted: "Resolved that the president and secretary of the Harrison Home Company be and the same are hereby authorized, empowered and directed to sell, contract to sell, mortgage, lease and convey any and all prop-

erty of said corporation, on such terms as they may deem best and advisable, and the said president and secretary are hereby authorized, empowered and directed to execute all deeds, mortgages, releases, leases or other instruments necessary to carry into effect the sales, mortgages, leases or otherwise herein provided." At the second meeting, held in November, 1899, a resolution was adopted authorizing the president and secretary to purchase, receive, and accept such property as the president or secretary deemed advisable, and authorizing the president and secretary to exchange property of the corporation for other property, and to execute the necessary papers.

The minutes of the board of directors show that meetings of that body were frequently had up to December 27, 1902. At these meetings reports were received from the president, C. G. Harrison, and "accepted" by the directors, showing the business transacted, including sales of many parcels of the property of the corporation, but there is nothing therein or in any other evidence submitted, tending to show that any contract of sale or conveyance was ever executed by the president alone, or in any other manner than as authorized by the resolution relative thereto,—viz., by the president *and* secretary jointly. No meeting of the stockholders was held after the first meeting until July 5, 1905, and no meeting of the directors from December 27, 1902, until July 11, 1905. No new officers of the corporation were elected until July, 1905.

C. G. Harrison died intestate September 7, 1904, and no administration had been commenced in the matter of his estate at the time of the transactions in question or the time of the trial of this case. Until his death he acted as president of the corporation, but it does not appear that the course of business in regard to the transfer of real estate owned by the corporation ever differed from the method prescribed by the resolution hereinbefore set forth. From the time of his death Mrs. Harrison acted as president, as she was entitled to do under the by-laws, but the very few conveyances of real estate made prior to the transaction in question were executed by her and the secretary jointly, and no departure from the prior course of business in that regard is shown. She signed checks alone as her husband had previously done, but that was expressly authorized by the by-laws. The funds of the

corporation were drawn upon in many instances for the private use of the widow, daughter, and son, but we do not regard that as material in determining the question before us.

On May 31, 1905, Olive M. Harrison, the secretary, died. It was stipulated by the parties that she died intestate, never having been married and being without issue. She was then a woman of about thirty-five years of age. She died the owner of the four hundred and ninety-eight shares issued to her at the time of the formation of the corporation. No administration in the matter of her estate had been commenced at the time of the trial of this action. There is nothing to show that she did not leave debts which must be paid out of her estate, sufficient in amount to entirely exhaust it.

Within fifteen days after the death of Olive M. Harrison, —namely, on June 15, 1905, the writing which serves as the basis of plaintiffs' claim was executed by Mrs. Harrison, purporting to bind the defendant corporation by her, as president. It read as follows:—

"LOS ANGELES, CAL., June 15th, 1905.

"I hereby authorize Henry R. Higgins as exclusive agent to sell lots 1 and 2, in block J, Morris Vineyard tract, . . . at any time within fifteen days from this date, to net me the sum of (12,000) twelve thousand dollars cash. Said Higgins must get his commission and pay for his services over and above said sum of $12,000 such sum as he adds to $12,000. I agree to convey or cause to be conveyed said property by deed, free and clear of all encumbrance on the payment to me of said sum of $12,000 net cash. I also agree to furnish the purchaser a complete certificate of title to said premises.

"HARRISON HOME COMPANY,

"Sarah J. Harrison, Pres.

"Witness:

"Hugh W. Harrison.

"In duplicate."

On June 17, 1905, said Higgins, purporting to act as agent of the Harrison Home Company, and signing the agreement "Harrison Home Company, by Henry R. Higgins, agt.," entered into a written agreement with plaintiffs to sell them this property for thirteen thousand, six hundred and twenty-five dollars, five hundred dollars of which was deposited in escrow by Higgins and plaintiffs at the time of the agreement

with the Title Insurance and Trust Company, and the balance of which was tendered within the time specified in the agreement "on or before June 30th, 1905." No part of the consideration was ever accepted by the defendant or by Mrs. Harrison.

On June 16, 1905, C. C. Tatum and Company, as agents, accepted a deposit of five hundred dollars on the same property from interveners, executing to them a written agreement reciting that it was received as a deposit on account of the purchase of such property for twelve thousand dollars, and that the sale was made by Tatum & Company as agents for the Harrison Home Company, and subject to their approval. On the same day, and prior to the execution of plaintiffs' agreement by Higgins, Mrs. Harrison was induced to sign a statement at the end of the agreement, reading as follows: "We hereby agree to all of the conditions herein contained," the signature being "Harrison Home Company, owner, Sarah J. Harrison, Pres." The interveners also signed as purchasers. The deposit of five hundred dollars was held by C. C. Tatum & Company, and no part thereof was ever accepted or received by the defendants, or Mrs. Harrison. It may be assumed that interveners duly tendered the remainder of the cash portion of the purchase price and a note and mortgage for the balance.

According to the findings of the court, the property was reasonably worth eleven thousand five hundred dollars on June 15, 1905, thirteen thousand, six hundred and twenty-five dollars on June 17th, and eighteen thousand dollars and more ever since July 1, 1905.

On June 28, 1905, Mrs. Harrison by a letter written by her attorney and approved by her, notified the Title Insurance & Trust Company that she declined to do anything further under either of the alleged contracts, "on account of misunderstanding and seeming misrepresentations" by which they were obtained, and also "by reason of the fact that Mrs. Harrison has not the requisite authority to enter into such a contract or to fulfill it on behalf of the Harrison Home Company." This refusal was duly communicated to the parties and this action followed.

It is an elementary principle of corporation law that the president of a corporation has no power merely because he is

president to bind the corporation by contract. The management of the affairs of a corporation is ordinarily in the hands of its board of directors, and the president has only such power as has been given him by the by-laws and by the board of directors, and such other power as may arise from his having assumed and exercised the power in the past with the apparent consent and acquiescence of the corporation. The general rule in this regard is stated in 2 Cook on Corporations, section 716, as follows: "The president of a corporation has no power to buy, sell, or contract for the corporation, nor to control its property, funds or management. This is a rule which prevails everywhere, excepting possibly in the state of Illinois. . . . It is true that the board of directors may expressly authorize the president to contract; or his authority to contract may arise from his having assumed and exercised that power in the past; or the corporation may ratify his contract or accept the benefits of it, and thereby be bound. But the general rule is that the president cannot act or contract for the corporation any more than any other one director." (See *Alta Silver Min. Co.* v. *Alta Placer Min. Co.,* 78 Cal. 629, 632, [21 Pac. 373]; *Bliss* v. *Kaweah etc. Co.,* 65 Cal. 502, [4 Pac. 507]; *Salfield* v. *Sutter etc. Co.,* 94 Cal. 546, [29 Pac. 1105]; *Blood* v. *La Serena etc. Co.,* 113 Cal. 221, [41 Pac. 1017, 45 Pac. 252]; *Barney* v. *Pfoor,* 117 Cal. 56, 58, [48 Pac. 987]; *Northwestern etc. Co.* v. *Whitney,* 5 Cal. App. 105, 108, [89 Pac. 981].)

It is clear that the president of defendant corporation was never expressly authorized by by-laws or resolution of the board of directors to execute on behalf of the corporation a contract for the sale of real estate. So far as the by-laws are concerned, his power in regard to contracts for the sale of real estate was to sign such contracts as had first been approved by the directors, and the provision that he should have direction of the affairs of the corporation, subject to the advice of the directors, did not limit the effect of the prior provision so far as such contracts were concerned. The resolution of the board of directors authorized such contracts only when jointly executed by the president *and* secretary. The president's want of express authority to make either of these contracts on behalf of the corporation is thus affirmatively made to appear. It is also clear that the power to execute a binding

contract of sale of real estate owned by the corporation could not be implied from the mere fact that he was the principal executive officer of the corporation invested with general direction of its affairs. It was not within the apparent scope of the business intrusted to him that he should have any such power.

The principal claim of plaintiffs and interveners is that defendant corporation is estopped to deny the binding effect of the acts of Mrs. Harrison.

In the discussion of this branch of the case, much is made by appellants of the asserted fact that Mrs. Harrison is the owner of all the stock of the defendant corporation and is really the only person interested therein, and that she is here using the corporation simply to protect herself against her contract for the conveyance of what is practically her own property. If we assume that her ownership of all the stock would be a material factor, the trouble with appellants' position is that the record does not warrant the conclusion that the stock is so owned. Olive M. Harrison, the daughter, upon the record before us, must be held to have been the absolute owner, at the time of her death, only two weeks before the transactions in question, of four hundred and ninety-eight shares, practically one half of the entire stock of the corporation. Giving the utmost force to the stipulation of the parties as to her dying intestate, never having been married and without issue, the property left by her is subject to administration and the payment of her debts, and Mrs. Harrison will have only what is left after administration. It cannot be assumed that Olive M. Harrison did not leave creditors, or that it will not be necessary to sell in due course of administration all or some portion of her stock to pay debts and expenses of the administration. Under these circumstances, Mrs. Harrison did not have absolute control of such stock at the time of the transactions in question, or at any time prior to the trial of this action, and cannot be held to have been such an owner thereof that her acts could affect the stock owned by her daughter at the time of her death.

There is nothing in the record warranting the assumption of learned counsel for plaintiffs and interveners that prior to the transaction in question the president of defendant corporation had ever assumed and exercised any power to bind

the corporation by his own contract for the disposition of its real estate. So far as appears, the course of business of the corporation in relation to sales of real property had always been in strict accord with the method prescribed by the by-laws and the resolution of the board of directors, and the transactions in question were the first instances of any different course. The conveyances introduced in evidence were all executed by the president and secretary jointly, and, for aught that appears here, contracts for sale had been similarly executed. The minutes of the corporation do not show anything inconsistent with this view. We have not, therefore, a case where the corporation can be held estopped from denying' the power of the president by a course of dealing on the part of that officer acquiesced in by the corporation through its board of directors. The authorities cited by counsel in support of the well-settled rule that a corporation may be so estopped cannot be held applicable. In *Bates* v. *Coronado Beach Co,.* 109 Cal. 160, [41 Pac. 855], a contract of partnership for the purchase and sale of lands entered into by the president and general manager of a corporation on behalf of the corporation was upheld on the ground that "it fully appeared from the evidence that he had assumed the management and control of the general business of the appellant with full knowledge and acquiescence of its officers, and that at a meeting of its stockholders held subsequent to the making of this contract all of his acts were ratified and confirmed by them." In *Pettibone* v. *Lake View Town Co.*, 134 Cal. 227, [66 Pac. 218], a contract of employment entered into by the president of a corporation engaged in the business of selling lands on behalf of such corporation with one engaged by him to sell land for the corporation was upheld. It was held that the finding that he was authorized to execute such a contract was supported by evidence that there was a general resolution authorizing him to make conveyances, and that ever since the business was commenced he had executed deeds, made land contracts, and collected the money thereon, all with the acquiescence of the directors and all others interested in the corporation. The case of *Crowley* v. *Genesee Mining Co.*, 55 Cal. 273, involved a contract of employment made on behalf of a mining company for work on its mine, made by one who was both president of the company and superintendent and managing agent

CLV Cal.—9

of such mine. The action was for money due an employee under such contract. Such a contract was clearly within the apparent scope of the business intrusted to the officer, a contract for work and labor in and about the mine of which he was the superintendent. It was held that authority to make such a contract could be inferred from the relations of the agent to the corporation, and the court approvingly quoted from an Illinois case as follows: "A corporation which suffers appearances to exist, and its officers and agents to so act, as to give one employed by such officers and agents reason to believe that he is employed by the company, becomes liable to such person as his employer to pay for the services rendered." A Michigan case much relied on by appellants, that of *Whitaker* v. *Kilroy*, 70 Mich. 635, [38 N. W. 606], was an action by the receiver of a corporation engaged in the business of selling steam engines against the purchaser of an engine for an alleged balance due on account thereof. The engine had been furnished under a written contract entered into by the superintendent at the agreed price of five hundred dollars, which had been paid, and the contract was upheld, the court saying: "We think that persons dealing with such a corporation for work have a right to get their information from the person whom the corporation has put in charge, and cannot be required to go elsewhere, and that contracts so made are valid contracts when relating to the ordinary concerns of such business." The case was clearly one where the act done was within the apparent scope of the authority of the officer intrusted with the general management of a going manufacturing concern. The cases we have referred to are examples of the general line of cases relied on by appellants. They simply affirm what are well-settled rules,—viz., that a corporation will be bound so far as third persons are concerned by the acts of its agent which are within the apparent scope of his authority, and that the authority of an officer to make certain contracts on behalf of the corporation may arise as to third persons from his having assumed and exercised that authority in the past with the acquiescence of the corporation, and that a corporation may ratify and render binding a contract entered into by one of its officers in excess of his authority. None of these rules has, in our judgment, any application upon the record before us.

There was no acceptance by defendant of any benefit of either of these transactions and consequently no estoppel on that ground. In the closing brief of plaintiffs, it is urged that by the escrow deposit of five hundred dollars made at the time of the attempted agreement between Higgins and plaintiffs, the defendant corporation was absolutely bound. We do not see how this could be so. If Mrs. Harrison was not authorized to make the contracts of sale on behalf of the corporation, Higgins's action in entering into the contract with plaintiffs was without warrant. He had no authority from the corporation to accept on its behalf any deposit, or to agree that such deposit should be made in escrow for its benefit. The rule that the acceptance by an authorized agent is the acceptance of the principal has no application.

Upon plaintiffs' appeal, in view of our conclusion that the findings to the effect that defendant never made either of the alleged agreements for sale are supported by the evidence, there is no other matter discussed in the briefs that requires notice.

On their appeal from the order denying their motion for a new trial, interveners urge as additional grounds for reversal that other findings than those above discussed are not supported by the evidence, that there was a failure to find on several material issues, and that several material findings are absolutely conflicting and irreconcilable. Objection is made by respondent to the consideration of the last of these claims because there is no appeal by interveners from the judgment, and it is urged that such a claim cannot be made on an appeal from an order denying a motion for a new trial. It is well settled that the failure of the trial court to make a finding of fact upon a material issue renders the decision one against law, and that a motion for a new trial will lie on that ground. (See *Great Western Gold Co.* v. *Chambers,* 153 Cal. 307, [95 Pac. 152], and cases there cited.) As said in *Swift* v. *Occidental etc. Co.,* 141 Cal. 166, [74 Pac. 701], "the omitted fact being essential to the judgment, a new trial for the purpose of determining the issue is the appropriate remedy, and the refusal to grant it is reviewable on appeal from the order." It may be that where there are hopelessly conflicting findings upon a material issue, the situation is the same as if there were no finding at all thereon. Take for instance a suit on a

promissory note where the trial court finds upon the material issue of payment that the note had been fully paid and also that no part thereof has been paid. It might well be said in the face of such irreconcilable findings that the court had not determined the issue of payment at all, and that the decision was therefore against law in the same sense as it would have been had neither finding been made. The answer to interveners' claim as to conflicting findings lies in the fact that there is no conflict in the findings as to the execution of the contract. It is positively and unequivocally found that defendant never entered into either of these contracts, and the other findings contain nothing inconsistent with this. In view of the condition of the pleadings and the issues made thereby, these findings wholly dispose of interveners' case, and necessitate judgment against them regardless of the other issues made by the pleadings. It is therefore immaterial here whether other findings are sufficiently supported by the evidence, whether there are findings upon other issues, and whether findings in regard to some other issues are conflicting or unintelligible. (*Great Western etc. Co.* v. *Chambers,* 153 Cal. 307, [95 Pac. 152].). The claim that the findings do not support the judgment is of course not available on motion for a new trial. (*Swift* v. *Occidental Mining Co.,* 141 Cal. 165, [74 Pac. 700].)

The judgment and orders denying a new trial are affirmed.

Shaw, J., and Sloss, J., concurred.

Hearing in Bank denied.