## AGGELLER & MUSSER SEED CO. v. BLOOD.

No. 4581. Decided June 14, 1928. (272 P. 933.)
Rehearing Denied December 19, 1928.

**122**

*Frazer & Wallis*, of Salt Lake City, for appellant.

*Badger, Rich & Rich*, of Salt Lake City, for respondent.

THURMAN, C. J.

This action was commenced by the plaintiff, a California corporation, located in the city of Los Angeles, against the Guaranteed Securities Company, a Utah corporation, located in Salt Lake City. By stipulation of the parties George H. Blood, receiver for the Utah corporation, was substituted as defendant. The California corporation will hereinafter be referred to as plaintiff, and for brevity the Utah company will be referred to as defendant.

It is alleged in the complaint that on or about the 21st day of March, 1923, plaintiff and defendant entered into a lease agreement by the terms of which plaintiff devised to the defendant certain premises in the city of Los Angeles described as the entire third floor loft in the building numbered 752 on South Spring Street, and extending through the block and numbered 755 South Main street over the stores occupied by the lessors; that the term of said lease was a period of five years, beginning the 1st day of April, 1923, and ending the 31st day of March, 1928; that defendant agreed to pay plaintiff therefor the total sum of $24,000 in monthly installments of $400 per month, but, in the event either lessor or lessee should determine that it was desirable to have the elevator changed from an automatic to a manual control, and the lessor should employ

such operator, the rental should then be the sum of $450 per month. The written lease was referred to and made part of the complaint.

It is then alleged that manual control was afterwards substituted for automatic control, and that under the terms of the lease there became due from defendant to plaintiff the sum of $450 per month from May 1, 1924, to November 30, 1925, together with interest thereon, which interest amounted to the sum of $439.89; that defendant has not paid said sum nor. any part thereof, except that defendant has a credit thereon of $60 per month, received by plaintiff from another tenant to whom plaintiff rented a portion of said premises for the purpose of minimizing the damages; that said rental to said other tenant commenced November 1, 1924, and had continued ever since; that defendant was entitled to cerdit for the full amount of said rental received from said tenant, except the sum of $132.30 commission paid by plaintiff on or about November 1, 1924, for obtaining said tenant; that the total credit due defendant is the sum of $647.70, leaving a balance due plaintiff from defendant in the sum of $8,333.19, together with. interest thereon at the rate of 7 per cent. from November 1, 1924, for which sum plaintiff prays judgment and costs.

The written lease agreement purports to be signed by the president and secretary of the plaintiff corporation and sealed with its corporate seal. On the part of the defendant company the lease agreement purports to be signed by J. J. Morey, as president of said company, and by C. E. Robinson, as secretary, and sealed with the corporate seal of defendant.

The defendant answering the complaint admits that the lease was signed in the name of defendant by J. J. Morey, president, and C. E. Robinson, secretary, and that defendant's corporate seal was affixed to said lease. Defendant further admits that said J. J. Morey was president of defendant company at the time the lease was executed, but denies that C. E. Robinson was secretary of defendant com-

pany. Defendant alleges that the said lease was at no time authorized, ratified, or approved by the board of directors of defendant, all of which was known to plaintiff; that for said reason said lease has no binding effect upon the defendant. Defendant further alleges that at the time said lease was executed, and in accordance with its provisions, it was understood and agreed that the lease was merely temporary with respect to defendant, and that another corporation was to be subsequently formed to take over said lease, and that thereupon defendant should be wholly absolved and relieved from any liability, responsibility, or obligation in connection with said lease. Defendant further alleges that a new corporation was subsequently formed, to wit, Guaranteed Mortgage Securities Company of America, Incorporated, and that it took possession of the said lease and said leased premises on or about July 1, 1923, with the knowledge and consent of the plaintiff, and continued in possession until the 1st day of May, 1924; that during all of said last period of time the said Guaranteed Mortgage Securities Company of America, Incorporated, paid the rent on said premises to the plaintiff, and plaintiff recognized said last-named company as its tenant and as the holder of said lease during all of said period of time, and at no time made any objection on account of the occupancy of said premises by said company.

Defendant admits it has not paid rental to plaintiff as alleged in its complaint, and denies generally every allegation of the complaint tending to show any liability of defendant on account of said lease.

Further answering, defendant alleges on information and belief that on or about May 1, 1924, the Guaranteed Mortgage Securities Company of America, Incorporated, vacated the said premises, and that shortly thereafter and before November 1, 1924, the plaintiff occupied, for its own use and benefit, the whole of said premises, excepting that occupied by one Hutchinson, the other tenant hereinbefore referred to, and continued to so occupy the same from short-

ly after the 1st day of May, 1924, up to and including the month of November, 1925. Defendant, as a further defense, alleges, in effect, the same matter covered by its answer as above stated.

Plaintiff's reply to the answer is in effect a denial of each and every allegation thereof which in any manner controverts the allegations of plaintiff's complaint.

The cause was tried to the court, and findings made in favor of the plaintiff. From the judgment entered thereon, defendant appeals.

The principal questions raised by defendant's assignment of errors are: (1) Was the lease in controversy authorized, ratified, or approved by the defendant company? (2) Did the vacating or abandonment of the leased permises by the occupant thereof in May, 1924, operate as a surrender thereof, and, if so, was such surrender accepted by the plaintiff?

It is admitted that J. J. Morey was the president of the defendant company, and that he executed the lease as such, and that the corporate seal of defendant company was affixed thereto. It also appears from the undisputed evidence in the case that C. E. Robinson was the assistant secretary of the defendant company, and that he also signed the lease. The contention of defendant is that it was understood and agreed that the lease was only temporary as far as the defendant was concerned, and that a new company was to be formed which would take over the lease and the assets of the defendant company at Los Angeles, and that the defendant would then be absolved from all further liability under the lease. The contention of plaintiff is that it was understood that the defendant intended only to change the name of the Los Angeles branch of the company merely for purposes of identification, and that otherwise there was no change in the company. In support of this contention it relies on the following paragraph in the lease: "Lessee contemplates changing its corporate name, and if such change is made, will immediately notify lessor."

It is undisputed that in July, 1922, J. J. Morey, as president of defendant company, was authorized by its board of directors to open a branch office in the city of Los Angeles and in other states mentioned, with full power to employ such officers to manage said office and on such terms and conditions as he should judge wise and prudent. It also appears from the records of the defendant company that Roland G. Paul was elected general sales manager, and C. E. Robinson, second assistant secretary and treasurer and office manager, of the Los Angeles office. Several trips were made by the president, Mr. Morey, to Los Angeles between July, 1922, and March, 1923, when the lease in question was executed by plaintiff and defendant. During that period of time an office was opened and business carried on by defendant in Los Angeles, but on different premises than those described in the lease. In February, 1923, Mr. Morey, who had just returned from a trip to Los Angeles, reported to the board of directors of defendant that the plan upon which the business had been carried on in Los Angeles "is not suitable to our purposes and advises a change be made through action of our attorneys." Whereupon a resolution was adopted by the board fully authorizing "the president to negotiate a plan for the incorporation or financing of the Los Angeles branch of this business on such terms and conditions as the president, in connection with the executive committee should deem advisable." Mr. Morey returned to Los Angeles, and on March 21, 1923, executed the lease in the name of the defendant company, and the same was signed by Robinson, as secretary, and sealed with the corporate seal of defendant, as hereinbefore stated.

There is a sharp conflict in the evidence as to what was said and what the understanding was on the part of the parties participating in the negotiation leading up to the execution of the lease in March, 1923. W. B. Early, secretary and treasurer of the plaintiff company, was the principal negotiator on the part of the plaintiff. Mr. Morey,

the president, acted on behalf of defendant. Early testified he first investigated concerning the financial responsibility of defendant with the view of determining whether further security would be demanded in addition to payment in advance for the last month of the term. He found the financial standing of defendant satisfactory, and the lease was executed accordingly.

A. E. Aggeller, vice president of plaintiff, also participated to some extent on behalf of the plaintiff in the negotiations, and to the extent that he testified his testimony corroborates that of Mr. Early. Neither of these witnesses made any inquiry as to the authority of Morey and Robinson, and as far as the record discloses neither of them had ever seen Morey or Robinson, nor had they ever heard of the defendant corporation or its manner of conducting its affairs.

On the part of defendant, Morey testified that at the time of the negotiations he told Early that as far as the defendant company was concerned it was going out of business in Los Angeles, and that its branch office there would be taken over by a company to be later organized, and that the lease was to be transferred to that company. It appears that a company was afterwards organized under the name of the Guaranteed Mortgage Securities Company of America, Incorporated, and went into occupancy of the leased premises July 1, 1923. Morey's testimony was corroborated in part by Robinson, who, as assistant secretary of defendant, signed the lease and affixed the corporate seal thereto. President Morey was himself a member of defendant's executive committee. Jeremiah Stokes and Louis A. Bailey were the other members. They testified that they knew nothing of the execution of the lease. Bailey said he never heard of it before the trial. Stokes testified he never heard of it until more than a year after it was executed, when plaintiff made demand for the rent. Morey never consulted either of them concerning the execution of the lease. Charles E. Hayes, secretary and treasurer of the defendant, testi-

fied to the same effect. The testimony of these witnesses disclosed the fact that defendant's business was conducted in a loose and careless manner. It appears that the board of directors held meetings from time to time, at which minutes were kept showing formal resolutions and other corporate action, but little or nothing appears in the records of the company in the way of financial reports or any reports showing how the money of the company was expended or the amount thereof. The members of the executive committee, Stokes and Bailey, hardly knew when they were appointed on that committee; in fact, it is not absolutely clear that they were appointed at all. Bailey admitted he knew but little about the business; that he was merely a figurehead; and that Morey dominated. He did not know whether the other members of the board were figureheads or not. Stokes, while not expressly admitting that he was a mere figurehead, appears from the evidence to have been about in the same category as Bailey. Morey went to Los Angeles in March, 1923, just before the execution of the lease, and remained there until April, 1924, during all of which time, as far as appears from the record, there was no report made by him to the defendant or to the other members of the executive committee. George H. Blood, receiver of defendant, testified about to the same effect as the other witnesses concerning the loose manner of carrying on the business. His testimony was based upon his examination of the company's records. He found no entries of money sent by defendant to the Los Angeles branch, but in correspondence between Hayes and Morey he found that money had been transmitted; that there was apparently no system of accounting. He failed to find any accurate record of their transactions between the two points. "The business seems to have been very much guided by one man, and that man was Morey." Secretary Hayes testified there was no money sent to Los Angeles to pay rent under the lease. Money was sometimes sent for a designated purpose and sometimes when no purpose was

designated. There was no arrangement between the two offices determining the amount to be remitted. Morey would either write or wire for it. He thought reports were made once a month by Robinson. They showed itemized receipts and disbursements. Witness felt that Morey was a competent and experienced man and left it to his judgment.

The foregoing is a brief statement of the main features of the evidence which bear in any manner upon the authority of Morey and Robinson to execute the lease. If other features appear to be material, they will be referred to in their proper connection.

The trial court found that plaintiff and defendant entered into the lease agreement substantially as alleged in the complaint. It further found that the lease was executed by the president and assistant secretary by authority of the board of directors of the defendant, and that it was not understood and agreed that the lease was merely temporary with respect to the defendant corporation, and that another corporation was to be subsequently formed to take over the lease, and that defendant was to be absolved and relieved from liability under the lease. It further found that, if any authority in J. J. Morey, president, and C. E. Robinson, secretary, to enter into said lease was lacking, the said defendant held out said president and secretary as having been fully authorized and empowered to represent said defendant, and thereafter ratified, confirmed, and approved their actions in connection with said lease, and waived all objections, if any they had, to its binding character.

Such are the findings on the question of authority to execute the lease. The evidence does not disclose any initial authority given by the board to President Morey or to Robinson to execute the lease or to formulate any new plan of carrying on the business in Los Angeles, except in connection with the executive committee of the defendant, as provided in the resolution of the board of direc-

tors of defendant on March 13, 1923. According to the undisputed evidence, the members of the executive committee, other than the president, had no knowledge of the execution of the lease. They had no knowledge that any such lease was to be executed, and in fact were never consulted concerning the execution of a lease for the carrying on of any business in Los Angeles after the resolution above referred to. It will be remembered that on March 13, 1923, Morey, who had just returned from Los Angeles, reported to the board that the plan hitherto adopted by the board for carrying on the business in Los Angeles was not suitable for the purposes of the defendant company, and recommended a change. The resolution was accordingly adopted authorizing Morey, as president, to negotiate a plan in connection with the executive committee. Morey thereafter immediaely, without consulting the other members of the committtee, returned to Los Angeles, and, together with Robinson, who was already there with the defendant's corporate seal, executed the lease. Morey remained in Los Angeles for a period of 13 months before returning to Utah, and during that period the Guaranteed Mortgage Securities Company was organized and entered into the occupancy of the leased premises under the lease, as to all of which according to the evidence, none of the officers of the defendant company had any actual knowledge, except the officers who executed the lease, and whose acts are in question here. So that, as far as initial authority to execute the lease is concerned, there was none, and that feature of the controversy need not be further considered.

Passing for the present the question of apparent authority by "holding out," we will next consider whether or not there was a ratification of the execution of the lease by the defendant company.

It is not contended that the power exercised by the president and secretary in executing the lease was ultra vires. The execution of leases, mortgages, and other instruments were within the powers conferred upon the defendant's

board by the articles of incorporation. The duty of executing such instruments as were authorized by the board were assigned to the acting president and secretary. It is, however, a general rule of law that knowledge of material facts is a necessary element in ratification. Fletcher, Cyc. Corp. Vol. 10, P. 366, states the rule as follows: "Ratification, to be effectual, must have been made with a full knowledge of all material facts. Ratification of dealings between a director and the corporation by acquiescence alone must be based on knowledge plus opportunity to act. However, ratification of a contract is binding although the corporation had no knowledge as to the commissions agreed to be paid."

As to how a ratification may be generally effected, the same author, at page 369 of the same volume, says:

"Ratification may be informal. It need not be by formal vote. The assent of a corporation to acts done on its account may be inferred in the same manner that the assent of of a natural person may be.

"Acquiescence by silence may amount to ratification as well as affirmative action. Acquiescence may rest on the principle of ratification or upon the principle of estoppel."

It will be remembered, however, that acquiescence without knowledge of material facts is not ratification. Referring again to the same author, same volume, page 370, it is said: "Acceptance of benefits with knowledge is an implied ratification. Acceptance of benefits of a contract estops the corporation to deny the authority of the contracting officer. Authority or ratification may be inferred where the corporation receives and retains property by virtue of the contract. For instance, acceptance of services rendered with full knowledge of the contract under which rendered is a ratification of such contract. So a corporation cannot repudiate a lease, on the ground of a want of authority of its agent to execute it, where it has enjoyed its

benefits for many years. A corporation cannot deny the authority of its president to execute a note, when sued thereon, where it retains the property for which the note was given."

We have quoted somewhat copiously from Fletcher, an author of high standing, and deem it unnecessary to refer to other authority upon that particular question. The question is: Do the facts in the instant case measure up to the standard announced in the excerpts quoted? As before suggested, there is no evidence whatever in the record that any officer of the defendant company, other than Morey and Robinson whose authority is challenged, had any knowledge whatever of the execution of the lease or any of the terms thereof until more than a year after its execution. If it be contended that the defendant was negligent in not making inquiry as to what its officers were doing in Los Angeles, and therefore chargeable, such contention is not tenable in view of the undisputed facts. When Morey went from Salt Lake City to Los Angeles in March, 1923, without consulting the other members of the executive committee as to a new plan of operation in Los Angeles, and continued there for over a year without communicating to the other members of the committee as to what, if anything, he had done or what his plan of operation was, what right had such members of the committee to assume that he had done anything at all under the resolution of March 13, 1923? Morey had recommended that the plan be changed. In view of the resolution then adopted, it could hardly be assumed that he was continuing on under the old plan, or that he had tentatively worked out a new plan to present to the other members of the committee. The business in Los Angeles under the old plan had evidently not been successful, and the board of directors felt justified, probably, in not giving the matter further attention until the president reported a new plan, which was never done. But it is contended that the defendant company received benefits under the lease, and therefore

ratified its execution and the terms thereof. "Acceptance of benefits with knowledge is an implied ratification." Fletcher, supra. The question here presented is: What benefits did defendant accept under the lease with knowledge? The evidence discloses none. If it be contended that it occupied the leased premises and had the benefit thereof, the evidence affirmatively shows that none of the officers of defendant company, except Morey and Robinson, knew the same were being so occupied. The testimony of Robinson, on the part of the defendant, was to the effect that the money from which the rent was paid under the lease was raised in Los Angeles; that none was ever sent for that purpose from the office in Salt Lake City. The testimony of other witnesses for the defendant was to the same effect. There is no evidence, as I remember the record, showing that any money was ever sent from Los Angeles to the defendant company in Salt Lake City. But respondent says in its brief that the defendant received 25,000 shares of the capital stock of the Guaranteed Mortgage Securities Company in consideration of the defendant turning over its assets in Los Angeles to the Guaranteed Mortgage Company. There are two answers to that: (1) Assuming that to be true, it does not appear that it had anything to do with the lease in question or was in any manner in recognition of the existence of the lease. (2) Besides this, if true, it might well support the defendant's contention that it was going out of business entirely in Los Angeles and was disposing of all its assets there for that reason. But the uncontradicted evidence is to the effect that the 25,000 shares of stock were sent to the defendant in Salt Lake City and refused because of the stockholders' liability statute in California, which made a stockholder of a corporation liable for the debts of a defunct corporation. In any event, we are unable to see how that circumstance in any manner tends to prove a ratification of the lease, or any knowledge thereof. Besides this, the undisputed evidence shows that the first information the defendant company received of the execution of the lease

was May, 1924, more than a year after the lease was executed, and that information came from the plaintiff in the form of a demand for rent under the lease. The defendant at once denied liability, and continuously thereafter challenged the authority of Morey and Robinson to enter into the lease agreement.

We come now to the question of apparent authority upon which plaintiff mainly relies. This, in the judgment of the writer, is a closer question than any heretofore considered.

In Fletcher, Cyc. Corp., vol. 3, § 1916, it is said: "Apparent authority is defined as 'that which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing,' and is distinguished from implied authority which is defined as 'that which the principal intends his agent to possess, and which is proper, usual and necessary to the exercise of the authority actually granted.' Apparent authority is also defined as 'such authority as the acts or declarations of the principal gives the agent the appearance of posssessing.' Closely related to this doctrine of apparent authority, and really a part of it, is the doctrine of estoppel under which a party who has knowingly permitted others to treat one as his agent will be estopped to deny the agency."

Applying this rule to the instant case, there are no facts in evidence which bring the case within the rule. Plaintiff produced two witnesses who participated in the negotiations leading up to the execution of the lease—Mr. Early and Mr. Aggeller. The first was secretary and treasurer of the plaintiff, and the second its vice president. Mr. Early was the principal actor. It does not appear that he ever saw Mr. Morey before the negotiations commenced. It does not appear that he ever heard of the defendant before, or knew anything about how it conducted its business. He asked no questions concerning Mr. Morey's authority to execute the lease, and the lease as finally prepared contains no resolution of defendant's board authorizing Morey to execute the lease.

The only thing, as it appears from the evidence, that Mr. Early was concerned about, was the financial condition of the defendant company. As to this he inquired of commercial agencies and found the financial condition of the company satisfactory. The same is true as to Mr. Aggeller. If either of these witnesses ever knew before these negotiations of the existence of the defendant company, to say nothing of its conduct of the company's affairs or Mr. Morey's connection therewith, it is not disclosed by the record. So that we are forced to the conclusion that this, at least, is not a case in which the doctrine of estoppel applies against the defendant company. Estoppel is usually, if not always, an element of apparent authority, not only in the case of corporations, but in the case of agency generally.

Plaintiff quotes several excerpts from sections 2033 and 2034, Fletcher, Cyc. Corp., vol. 3, which states the rule about as strongly in favor of plaintiff's contention as can be found anywhere in the general law. We quote from plaintiff's brief: "The management of the entire business of a corporation may be entrusted to its president either by express resolution of the directors or by their acquiescence in a course of dealings.  *  *  *  If the president is expressly named or appointed as general manager, or if he be put in active charge of all or a part of the corporate business, or if he is held out or permitted to act in behalf of the corporation in all matters or in regard to matters in a particular place, then his authority is measured by the rules relating to the authority of general or branch managers and not by the rules relating to the authority of a president by virtue of his office.  *  *  *  If the directors turn over the full and absolute management of all corporate affairs to the president, and in no way interfere with his acts, he has power to do any act which the directors could authorize or ratify.  *  *  *  Apparent authority of the president may be created by clothing him with apparent authority to act for the corporation in making contracts or doing other acts, as where it allows him (1) habitually to make such contracts or do such acts,

or (2) to manage the business generally, although no authority may have been expressly conferred upon him. * * * Furthermore, the president may have all the powers of the board of directors where they abandon the management of the corporation and leave the conduct of its business to him."

There is much evidence in the record, as appears from the statement we have made, to justify the conclusion that the defendant was careless and slipshod in the conduct of its business as a corporation, and that Morey exercised a dominating influence in the conduct of its affairs. There is but little in the evidence disclosing just what he did in particular and in what particular matters his influence was controlling. The board of directors met frequently, and much of its business was done by formal resolutions and corporate action.

In the absence of a holding out of apparent authority of which plaintiff was informed and upon which it relied, we are doubtful whether the facts disclosed by the evidence are sufficient to bring the case within the rule ■ announced in the excerpts last above quoted. It does seem that where a party deals with the officers of a corporation with which it is wholly unacquainted, and of the existence of which it is not informed, it is not in a position to hold such corporation liable for the unauthorized acts of its officers. To say the least, it certainly cannot hold such corporation liable on the theory of estoppel.

I am aware that there is a line of cases in some jurisdictions which hold that it is not necessary in all cases that the element of estoppel should exist in order to ■ bind the corporation, where it is contended that its officers have transcended their actual authority.

Fletcher, Cyc. Corp., § 1919, reads as follows: "It is held, at least in some jurisdictions, that where a corporation officer or agent is accustomed to do certain acts with the knowledge of the corporation, actual authority may be implied therefrom, without reliance on the doctrine of estoppel. Thus, it has been said that 'a customary act by an official

may be treated as valid and within the exercise of an actual authority, not necessarily because the company is estopped to deny its validity from having invested the officer with apparent authority to perform it, but because the inference can be drawn that he was, in truth, authorized.' It follows that even if the other party to the contract had no knowledge of such course of business on the part of the corporate officer or agent, so as to prevent an estoppel, yet the corporation may be held on the theory of actual authority, in states where this doctrine is recognized." See, also, section 1923, same author, which is to the same effect, but more elaborate. The cases for and against the rule are cited in the note.

The rule, as will be seen, is based upon the theory that the customary acts of a corporation's officer, if known to the corporation, may be such as to justify the inference that such officer is actually authorized to perform such acts, even though the other party to the contract has no knowledge of such course of business, so as to prevent an estoppel. To say the most, the rule is of doubtful validity when considered in the light of the authorities cited by the author. In any event, if such conduct of an officer is to be held as evidence of actual authority, as contradistinguished from apparent authority, it ought not to apply in a case such as this, where the action of the officer is in utter disregard of a formal resolution adopted by the board of directors. In such case, it seems to us, where no question of estoppel is involved, the corporation can protect itself against the customary conduct of its officer by express limitations upon his authority, as in the instant case. Otherwise, if an officer or agent has once been permitted by the corporation to indulge in such customary conduct, the corporation is thereafter forever powerless to place a limitation upon his continuing such course of conduct. Even if we admit the validity of the rule in question, we are of opinion the instant case is clearly distinguishable from the cases cited in support of the rule. This particular question is not discussed in the briefs of counsel. Plaintiff cites the following authorities: *Christensen* v.

*Hamilton Realty Co.*, 42 Utah 70, 129 P. 418; *Smith* v. *Bank of New England*, 72 N. H. 4, 54 A. 388; *Currie* v. *Bowman*, 25 Or. 364, 35 P. 850; *Scott* v. *Middletown, etc., R. Co.*, 86 N. Y. 207; *Campbell* v. *Pope*, 96 Mo. 468, 10 S. W. 187; *Mobile & M. R. Co.* v. *Gilmer*, 85 Ala. 422, 5 So. 138; *Bauersmith* v. *Extreme Mobile Gold Min. Co.* (C. C.) 146 F. 95; *Michigan, etc., R. Co.* v. *Chicago, etc., R. Co.*, 132 Mich. 324, 93 N. W. 882; *Brooks* v. *Geo. Q. Cannon Ass'n*, 53 Utah 304, 178 P. 589; 14a C. J. 399.

Appellant relies on the following cases: *Murray* v. *Beal*, 23 Utah 548, 65 P. 726; *Lochwitz* v. *Pine Tree M. & M. Co.*, 37 Utah 349, 108 P. 1128; *Black* v. *Harrison Home Co.*, 155 Cal. 121, 99 P. 494; *Conqueror Gold M. & M. Co.* v. *Ashton*, 39 Colo. 133, 90 P. 1124; *Gause* v. *Commonwealth Trust Co.*, 124 App. Div. 438, 108 N. Y. S. 1080; Mechem on Agency, 312; *International Magazine Co.* v. *National Radio Co.*, 67 Cal. App. 498, 227 P. 918; *Moyle* v. *Congregational Church Society*, 16 Utah 69, 50 P. 806.

It is unnecessary to review these cases in detail. They all go to the questions of initial authority, apparent authority, and ratification, which we have already discussed at considerable length. The quotations from Fletcher, and references thereto, substantially cover the same field, and detailed discussions of the cases would unnecessarily prolong the opinion.

We are of opinion that the findings of the trial court that the officers of defendant were authorized to execute the lease agreement are not sustained by the evidence.

In view of our conclusions, it is unnecessary to consider the other questions involved.

The judgment is reversed, and the cause remanded with directions to the trial court to grant a new trial at respondent's cost.

HANSEN and GIDEON, JJ., concur.
CHERRY and STRAUP, JJ., dissent.